In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-2991 & 14-3361

AUTONATION, INC., and VILLAGE MOTORS, LLC,

*Petitioners/Cross-Respondents*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

Petition for Review and Cross-Application
for Enforcement of a Decision and Order of
the National Labor Relations Board.
No. 13-CA-063676

ARGUED MAY 21, 2015 — DECIDED SEPTEMBER 4, 2015

Before WOOD, *Chief Judge*, and ROVNER and WILLIAMS, *Circuit Judges*.

WOOD, *Chief Judge*. Union activity was afoot at Libertyville Toyota late in the summer of 2011. When rumors to this effect reached it, Libertyville's owner, a company called AutoNation, held a series of meetings with the affected staff. An employee surreptitiously recorded the last of these meetings, a lengthy affair conducted largely by two AutoNation

executives. Around the same time, Libertyville suspended one of its employees, an automotive painter named Jose Huerta. The dealership's manager had received an anonymous voicemail accusing Huerta of promoting the union cause and of receiving a charge of driving under the influence. Once suspended, Huerta did not return to Libertyville. It ultimately fired him, but the parties disagree on when that happened and for what reasons. Both sides concur, however, that Huerta received a computer-generated letter from a third party vendor to AutoNation indicating that Huerta's employment would not be continued.

A local chapter of the International Association of Machinists and Aerospace Workers (the Union) filed charges against AutoNation and Village Motors, LLC (which did business as Libertyville Toyota—we refer to them in the singular as AutoNation) with the National Labor Relations Board in 2011. An administrative law judge (ALJ) concluded that certain comments by the AutoNation executives at the recorded meeting violated the National Labor Relations Act (the Act) in multiple ways. He did not, however, uphold the accusation that AutoNation had unlawfully suspended and discharged Huerta because of his union activity. A three-member panel of the Board, with one member dissenting on two points, affirmed the judge's conclusions about the meeting but reversed as to Huerta's discharge. AutoNation has filed a petition for review of the Board's rulings, and the Board has cross-applied for enforcement. Although we do not endorse all of the Board's language in its opinion, we conclude that substantial evidence supports its findings and that its decision is entitled to enforcement.

**I**

Libertyville Toyota is a 140-employee car dealership in the Village of Libertyville, Illinois. Its service department has 80 employees engaged in tasks such as fixing vehicles, painting them, and performing shipping and receiving. In August 2011, dealership management learned of discussions among technicians about unionizing. Not long afterward, Libertyville's general manager, Taso Theodorou, held a few brief meetings with workers in the service department to discuss the topic of unionization. On August 23, two members of AutoNation's corporate team joined Theodorou for another such meeting. We know what was said at this last meeting because a dealership employee secretly recorded it; the tape was subsequently transcribed; and the ALJ relied on it.

Theodorou opened the August 23 meeting and then turned it over to AutoNation vice president and associate general counsel Brian Davis. Davis was joined by Jonathan Andrews, one of the company's regional human resources directors. The transcript of the discussion among these men and the dealership's workers runs 111 pages; we focus here on those excerpts that concerned the Board and that are pertinent to the petitions before us.

On the same day as the meeting among Davis, Andrews, Theodorou, and the Libertyville employees, Theodorou received a voicemail at the dealership. The caller stated that she was "calling on behalf of the spouse of one of your employees," but she refused to identify herself because her husband was "afraid that if they find out that we're the ones who said anything, that they will retaliate." The caller accused two employees, Jose Huerta and Hermenegildo Tellez, of "trying to stir up this whole union and create issues."

Tellez and Huerta were having arguments with other employees, she said, and worse, they had "questionable" moral standards. In particular, she noted that Huerta "doesn't even have a license" and "had a DUI." The caller finished by opining that the situation with Huerta and Tellez was "definitely something that needs to be addressed."

After receiving the voicemail, Theodorou contacted Andrews to acquire a motor vehicle report on Huerta. When it arrived, the report showed that Huerta had a suspended driver's license. This was a problem, because Huerta was classified as a driving employee at Libertyville. He had signed copies of a dealership policy that required employees both to possess a valid license and to inform superiors of changes to their driving privileges. Davis admitted that Theodorou consulted him on how to proceed with Huerta. The ALJ found that Davis "advised Theodorou how to proceed, with a view toward protecting both Huerta and the Company." Theodorou told Huerta's immediate supervisor, service department director David Borre, to suspend Huerta. On August 26, 2011, Borre called Huerta in for a meeting during which Huerta admitted that he had received the DUI charge and that his driver's license was suspended. Borre told Huerta he was suspended until September 14 and asked him "to try to get his driver's license situation corrected." (Huerta's court hearing on his DUI charge was scheduled for September 13.)

One day after meeting with Borre, Huerta received a letter signed "2280-Libertyville Toyota." The letter informed Huerta "that information contained in a consumer report, if accurate, would prevent 2280-Libertyville Toyota from extending an employment offer, *continuing your current em-*

*ployment* or granting a promotion to you at this time" (emphasis added). The letter, dated August 25, 2011, invited Huerta to "contact Sterling within 5 business days" if he thought the attached background screening report was inaccurate. Although the letter itself gave no indication of who "Sterling" was, the attached report indicated that it had been prepared by a company called Sterling Infosystems. AutoNation contracted with Sterling to furnish motor vehicle reports on its employees, and Sterling automatically sent a letter when it found an adverse notation in an employee's driving record. On September 3, Huerta received another letter (dated September 1), also signed by "2280-Libertyville Toyota" but prepared by Sterling. This letter told Huerta "that an offer of employment, *a continuation of current employment* or the granting of a promotion *will not be made at this time*" (emphasis added). Not long after receiving this letter, Huerta applied for unemployment benefits with the State of Illinois. The Illinois Department of Employment Security promptly informed AutoNation about Huerta's filing, and Theodorou responded that Huerta had been suspended and not terminated. (There is no indication that he ever passed this news along to Huerta.) Huerta did not return to work, and Theodorou sacked him on September 21 for "job abandonment."

At the end of August 2011, the Union filed an unfair labor charge against AutoNation with the Board alleging that Libertyville had suspended Huerta because of his union activity. Three months later, the Union amended this charge to add a claim about Huerta's firing and to raise several new unfair labor claims against AutoNation. In December 2011, the Board's general counsel filed a complaint against Village Motors (later adding AutoNation) raising claims about AutoNation employees' statements at the August 23, 2011,

meeting and about Huerta's suspension and firing. An ALJ agreed that comments by Davis and Andrews violated the Act in multiple ways: (1) threatening that unionizing would be futile; (2) threatening demotion of unionizing employees; (3) threatening blacklisting of union supporters; and (4) impliedly promising salary increases if dealership employees did not vote in the union. The judge decided, however, that AutoNation had not committed an unfair labor practice in either firing or suspending Huerta.

After both the Board's general counsel and AutoNation filed exceptions to the judge's ruling, a three-member panel of the Board issued its decision. The Board affirmed the ALJ's findings that the AutoNation employees' comments at the August 23 meeting were unfair labor practices and that Huerta's suspension was not; it reversed the judge's finding on Huerta's discharge. One member of the panel dissented because he did not agree that AutoNation had made an implied promise of wage increases or that it had violated the Act by discharging Huerta.

AutoNation filed a petition for review of the Board's decision in September 2014. One month later, the Board filed a cross-application for enforcement of the panel's order. We have jurisdiction under 29 U.S.C. § 160(f).

## II

We begin with the heart of the case: the Board's finding that AutoNation and Village Motors violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), in four ways. The Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their guaranteed rights to organize and bargain collectively. We apply

a deferential standard of review to the Board's findings, looking only to see whether they are supported by substantial evidence. See 29 U.S.C. § 160(e). This means "such relevant evidence that a reasonable mind might accept as adequate to support the conclusions of the Board." *NLRB v. Teamsters Gen. Local Union No. 200*, 723 F.3d 778, 783 (7th Cir. 2013) (internal quotation marks omitted). Our "task is not to reweigh the evidence; it is only to determine whether there is evidence in the record supporting the Board's outcome that could satisfy a reasonable fact finder." *NLRB v. KSM Indus., Inc.*, 682 F.3d 537, 543–44 (7th Cir. 2012). We review the Board's applications of the law to the facts and its interpretations of the Act deferentially as well, taking care to ensure that "its legal conclusions have a reasonable basis in law." *Roundy's Inc. v. NLRB*, 674 F.3d 638, 645 (7th Cir. 2012) (quotations omitted).

The Board first determined that Davis through his comments at the August 23 meeting implicitly conveyed the message that it would be futile for the Libertyville employees to unionize. It supported that conclusion with substantial evidence. At one point shortly after the start of the meeting, an employee asked whether every technician at the dealership would get to vote on unionization. This prompted Davis to launch into a lengthy monologue about unionizing in general, in which he warned the employees to be "very careful" when listening to the union's "sales pitch." Davis continued: "[I]n many cases, when you enter these negotiations, if you ever get there, employees tend to lose things. Okay?" He went on to describe potential negotiations as "a wide open game of uncertainty" in which "nothing is guaranteed even if you win the election. All right?" Later in the meeting, an employee asked if the wage for the dealership's workers

would be less than $10.50 per hour if they unionized. Davis's response: "It's possible. … [W]hen I say that we sit down and we start from scratch, we start from scratch. We don't start with what you guys are making today. Everything goes to zero." Later still, Davis told the employees about "your brothers and sisters from other dealerships who deal with [union issues] on a daily basis," describing in particular a unionized workplace at an Orlando AutoNation dealership. There, Davis said, the unionized employees "have been living that nightmare for almost three years now with not one bargaining session, not one contract negotiation."

It was reasonable for the Board to conclude that Davis's message was that unionizing would cut off hope of negotiating for better working conditions, or, put otherwise, that it would be futile. As AutoNation points out, Davis said later in the meeting that if the workers were to unionize, "eventually the bargaining process will begin." But he promptly threw cold water on that thought by telling the employees that "[t]he bargaining process is—is never automatic" and that the workers "may never see … in your lifetime at the dealership" benefits that they think they "may be entitled to." Davis drove this point home with his allusion to the hardships that befell AutoNation workers in Orlando. AutoNation concedes that it held no negotiations with a unionized group of its employees in Orlando. But it attempts to turn this fact to its advantage by arguing that "truthful" examples of activity elsewhere simply illustrate the advantages and disadvantages of collective bargaining. That may be one reading, but another is that Davis's "truthful" example—indeed, the only example he offered—was an implied threat. The workers in Davis's example were AutoNation employees, not characters from a morality play about the pitfalls of

unionizing. And the Orlando example must be read in connection with the other two comments. Together, they supported a reasonable inference that Davis was telling the Libertyville employees that unionizing would likely not produce the benefits they were seeking.

The Board concluded next that Davis and Andrews made implied promises of wage increases to deter workers from supporting the Union. During the meeting, Theodorou had read aloud a question a worker had submitted previously on the topic of worker pay. The worker wanted to know if it was "possible without voting the union into the dealership that the dealers' [*sic*] current pay plan can be evaluated or updated more for progressing technicians whose current pay plan has a low pay ceiling." Andrews responded that such a thing was "absolutely possible," then added, "it's something we try to do every year," and that "the first thing we need to do" is to "look at that." Later, Davis said that "if we're not being fair or we're not being competitive to what you guys could get on the open marketplace on your own, I think there would be a definite willingness to consider making adjustments for those of you who are negatively impacted by that," adding, "we want a chance to address them [your concerns] before you pay somebody else to address them."

Although not everyone would understand these comments as implicitly interfering with the unionization effort or coercing employees, that is one interpretation, and the Board was authorized to adopt it. AutoNation contends that the statements were merely conditional, and that the Board's view leaves employers in the bind of not even being able to answer "maybe" when employees ask whether they will get a raise without a union. Yet AutoNation fails to acknowledge

the context that convinced the Board that these comments were implied promises. As we have noted, Davis said elsewhere in the meeting that the dealership's employees would probably not get to negotiate for better pay if they chose to bargain collectively. Yet when an employee asked whether better pay was possible without unionizing, Andrews's response was overwhelmingly positive. The Board reasonably saw Davis's subsequent comment (that he and Andrews wanted to address the employees' concerns about pay "before you pay somebody else"—the "somebody else" clearly referring to the Union) as a direct link between helping the employees and their rejection of the Union. The contrast, the Board thought, was sharp enough to imply to dealership workers that unionizing or not unionizing could mean the difference in positive consideration of a pay increase. As we said long ago, such implied promises "have a tendency to discourage employees from joining a union or engaging in union activities." *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 700 (7th Cir. 1976); see also *Beverly Enters., Inc. v. NLRB,* 139 F.3d 135, 143 (2d Cir. 1998) ("A finding of an actual or express promise is not necessary as an implied promise can suffice to establish the necessary element of an unfair labor practice.").

The Board's third conclusion was that Davis threatened the dealership's workers with demotions if they chose to pursue union activities. A worker asked whether the employees would "get demoted if we become a union shop." Davis first responded "I don't know," explaining that there was no way to predict the result of theoretical future negotiations with the union. An employee then surmised that under union rules, those workers who are not "journeymen" would be "dropped down or demoted" to "apprentice" sta-

tus. Davis responded, "That's exactly how it would be nego-tiated." Andrews appeared to cut Davis off and attempt to qualify this statement by telling the workers, "That's how a lot of them are." Davis then said, "[Y]ou need that structure. If not that identical structure, something similar to that would be negotiated … ."

The Board's finding that Davis threatened the workers with demotions reflected a permissible view of this evi-dence. His comments reasonably can be viewed as promis-ing demotion for certain workers (those classified as jour-neymen) if the employees voted for the union. AutoNation argues that Davis and Andrews never guaranteed that an apprentice/journeyman classification system would be part of any eventual collective bargaining agreement between AutoNation and the union. It also argues that the appren-tice/journeyman distinction was suggested by an employee, not by Davis or Andrews. Yet this is what the employee in question asked: "[I]sn't it also true that in the union, you have basically apprentices and journeymen?" Davis re-sponded, "Yeah, that's basically how it works." Thus Davis more or less confirmed the employee's assumption that the union had exactly this system. The fact that Davis did so af-ter Andrews injected some ambiguity into the discussion provides further support for the Board's conclusion.

Finally, the Board affirmed in a footnote the conclusion of the ALJ that AutoNation threatened employees with black-listing if they supported the union. Toward the end of the meeting, Davis responded to an employee who asked if un-ionization of the Libertyville dealership would be "some-thing that's going to follow you through your lifetime if you transfer to another store." Davis began inauspiciously by

telling the workers that "[t]he union will tell me that I'm threatening you by bringing this up. The bottom line is, that's the reality." He then said that other employers would likely be suspicious of job applicants who had worked in union shops, and that such employers could "be inclined to pass on you … because of that badge or that scarlet letter" of prior union membership, or even having "gone through" a campaign to enter a workplace that the union loses. The employee followed up by asking if "certain people's careers may be affected by this." Davis responded, "Absolutely."

The Board's finding that these comments amounted to a threat of blacklisting, far from being unreasonable, strikes us as the most natural understanding. Davis's statements were fairly unequivocal. He also told the workers, for example, that "[e]mployers don't want unions in their shops. … [T]hey're going to think twice about hiring you, even if they think you're a superstar. … If you commit yourself to [union representation], you've got to commit yourself to all of it, including those consequences." AutoNation's argument to the contrary turns on a distinction between threatening to blacklist employees for their union activity and warning of the "possible negative outcome" that other companies may not hire them for the same reason. That hair-splitting reading, however, was far from the only reasonable one. The ALJ addressed this criticism in noting that although Davis did not directly threaten anyone, he described the dim future career problems for unionized AutoNation employees as a certainty, not a possibility.

AutoNation's fixation on what it depicts as the tentative or merely factual nature of Davis's comments fails to take into account the applicable standard of review. The Act is

especially concerned with the economic power that an employer has over employees. The underlying message of Section 8(a)(1) is that an employer such as AutoNation needs to take care in the rhetoric it uses when discussing union issues with its workers. The standard of review makes irrelevant the question whether an employer's comments *might* have been viewed in a manner different from the way the Board understood them. We have often remarked on our deference to "the Board's expertise in matters of labor relations." See, *e.g.*, *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008) (internal quotation marks omitted). We need evaluate only whether substantial evidence supported the Board's finding—here, that Davis and Andrews's comments left the dealership's employees with the impression that they would experience a series of setbacks if they chose to vote for the Union. It was reasonable to believe that management's comments produced this impression. We therefore conclude that the Board's decision that the comments of Davis and Andrews at the August 23, 2011, meeting violated Section 8(a)(1) of the Act must be enforced.

## III

The remaining question is whether the Board's decision that AutoNation fired former dealership employee Jose Huerta because of his union activity is also entitled to enforcement. The Board concluded that Huerta's termination violated Sections 8(a)(1) and 8(a)(3) of the Act. The latter provision forbids "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). AutoNation's challenge to this finding was the only point it addressed at oral argument. It

contends that the Board misconstrued its own test for determining whether an employer's action violated Section 8(a)(3). Although there are isolated bits of language in the Board's opinion that could be clearer, we conclude that taken as a whole the Board applied the correct legal standard and that substantial evidence supported its conclusion.

In order to assert a *prima facie* case of discrimination under Section 8(a)(3), there must first be a "showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980); see also *Teamsters Gen. Local Union No. 200*, 723 F.3d at 786. There must be "a causal connection between the animus and the implementation of the adverse employment action." See, *e.g.*, *Huck Store Fixture Co. v. NLRB*, 327 F.3d 528, 533 (7th Cir. 2003); *Carry Cos. of Ill., Inc. v. NLRB*, 30 F.3d 922, 927 (7th Cir. 1994). Once the Board makes such a showing, the burden under *Wright Line* "shifts to the employer to prove that it had a legitimate business reason for making its decision." *Loparex, LLC v. NLRB*, 591 F.3d 540, 546 (7th Cir. 2009). At each step, the Board may rely upon circumstantial evidence. *Id.*

In this case, the Board said that the elements required to support a showing that an employee's union activity was a "motivating factor" for an adverse employment action are "[1] union or protected concerted activity, [2] employer knowledge of that activity, and [3] union animus on the part of the employer." The confusion on which AutoNation has seized comes from footnote 10 in the Board's opinion, where it said that *Wright Line* "does not require the General Counsel to make some additional showing of particularized motivating animus towards the employee's own protected activi-

ty or to further demonstrate some additional, undefined 'nexus' between the employee's protected activity and the adverse action." The Board then found "that Huerta's union activity was a motivating factor in his discharge," citing two reasons: first, that comments by Andrews and Davis at the August 23 meeting established AutoNation's anti-union animus, and second that AutoNation's proffered reason for firing Huerta was pretextual.

AutoNation contends that the Board misconstrued its own *Wright Line* test in finding that anti-union animus motivated the termination decision. This court has held, correctly in AutoNation's view, that there must be a showing of a causal connection between the employer's anti-union animus and the specific adverse employment action on the part of the decisionmaker. We have no quarrel with that abstract proposition. See also *Nichols Aluminum, LLC v. NLRB*, Nos. 14-3001, 14-3202, 2015 WL 4760303, at *5 (8th Cir. Aug. 13, 2015). Where we part company with AutoNation is with its insistence that the Board failed to find that precisely this causal connection existed here, or that any such finding was not supported by substantial evidence.

The rule that union activities must motivate a particular adverse employment action in order to make out a Section 8(a)(3) violation is well established; an abstract dislike of unions is insufficient. What the Board was saying in footnote 10 was that there was no need to prove *additional* animus beyond whatever animus lay behind the contested action. Thus, for example, if the company took the position that it would fire all union organizers, and then it fired Union Organizer A, there would be no need to show that it had an extra grudge against A related to union activity. In that exam-

ple, there is a clear nexus between the employer's anti-union animus and the particular action it took.

Even if one thought that evidence of additional particularized animus is necessary in every case, the result here would be the same. The Board pointed to circumstantial evidence that AutoNation's anti-union views played a central role in its decision to fire Huerta. This evidence began with the anonymous voicemail to Theodorou singling out Huerta for his pro-union activity and then accusing him of bad moral character because of his driving infraction. This call prompted Theodorou to act against Huerta. AutoNation argues repeatedly that Theodorou himself betrayed no anti-union animus, but that fails to take account of the whole story. The Board analyzed in detail Davis's comments at the August 23 meeting; it was well within its rights to conclude that Davis displayed *his* hostility toward union activity at this particular dealership, activity of which Huerta was an essential part. If Davis had not been involved, perhaps this would be a different case. But as Theodorou's consultation with Davis on the Huerta matter shows, Davis was Theodorou's superior—a person Theodorou turned to before taking adverse action against Huerta, whom Theodorou knew from the voicemail to be involved in union activity. The Board was not required to accept AutoNation's position that Theodorou's *action* to terminate Huerta was untainted by Davis's anti-union bias. Davis's involvement and the nature of the initial accusation against Huerta were such that we cannot disturb as unreasonable the Board's finding that Huerta's "protected conduct was a 'motivating factor' in the employer's decision." *Wright Line*, 251 N.L.R.B. at 1089. The Board also found that the pretextual nature of Theodorou's termination of Huerta established animus; we likewise de-

cline to disturb this conclusion, as we will discuss momentarily. See *Suburban Elec. Eng'rs/Contractors, Inc.*, 351 NLRB 1, 5 (2007) ("It is axiomatic that findings of antiunion animus and discriminatory motive may be predicated on pretextual reasons advanced for a personnel action.").

Despite its discourse on the *Wright Line* factors in footnote 10 of its decision, the Board referred repeatedly in the text of its opinion to the correct "motivating factor" requirement of *Wright Line*. It opened its analysis of AutoNation's actions toward Huerta by stating that under *Wright Line* "the General Counsel must prove that an employee's union or other protected activity *was a motivating factor in the employer's action* against the employee" (emphasis added). It later found that "the General Counsel met his burden of showing that *Huerta's* union activity was a motivating factor in his discharge" (emphasis again added). To the extent that the footnote may have deviated from *Wright Line* or introduced imprecision, that is regrettable but not fatal to the outcome in this case. We have no need to wade into an intramural dispute between Board members if it makes no difference to the outcome.

The next question that we must address is whether, applying *Wright Line*, substantial evidence supported the Board's finding that AutoNation's proffered reason for discharging Huerta was pretextual. AutoNation asserted that Huerta was fired for "job abandonment" when it terminated his employment on September 21, 2011. The Board thought this was pretext given the events that led Huerta reasonably to believe that he had been fired before that date. Huerta understood that he had been fired no later than September 3, when he received the second letter prepared by Sterling on

behalf of Libertyville Toyota (whose name appeared in the signature block). The letter said that "a continuation of current employment … will not be made at this time." This is not an exemplar of clear prose, but it is not surprising that an auto technician understood it to mean that Libertyville (the signer of the letter and the only entity for which he worked) had fired him as of "this time." The fact that Huerta applied for unemployment benefits right after he received that letter and stated in the application that he had been discharged is also good evidence that Huerta thought he no longer had his job. There was reason to believe that AutoNation, through Theodorou and Davis, knew of Huerta's filing, as the State of Illinois contacted it to inquire about that claim. "Thus, before terminating Huerta on September 21 (effective September 15) purportedly for abandoning his job," the Board found, "the Respondent knew that Huerta believed he had already been discharged, and the Respondent should have known why."

Substantial evidence supports this finding. AutoNation's argument to the contrary does not undermine the Board's reasoning. AutoNation insists that Theodorou could not have known about Huerta's belief that he was fired because Theodorou was not aware of the Sterling letters. This ignores the fact that Theodorou did know that Huerta had filed for unemployment, a fairly obvious indicator of Huerta's thoughts on whether he still had a job. This fact was central to the Board's finding: it stated that even if Theodorou did not know of the Sterling letters, he knew of Huerta's unemployment claim. It was therefore reasonable for the Board to find that Theodorou's subsequent firing of Huerta for "job abandonment" was pretextual. One does not abandon a job from which he already has been fired.

Finally, AutoNation challenges the remedy of reinstatement and back pay that the Board awarded to Huerta. This is because, AutoNation argues, "it is uncontested that [Huerta] would have been discharged for legitimate reasons." Nothing in the record supports such a flat assertion. AutoNation's argument is based on the fact that Huerta's failure to obtain a valid driver's license by the time he lost his job would inevitably have resulted in his firing. That is not so clear. If Huerta had not thought he was already out of work, he may have prevailed at his September 13 hearing to the extent of having even a limited driver's license for work purposes. The record also does not show how consistently AutoNation fired people who had a temporary problem with their license. Our consideration of this point is hampered by the fact that the parties did not develop the argument. It may, however, be raised at the compliance stage, as recommended in a case on which AutoNation is relying. See *Berkshire Farm Ctr. & Servs. for Youth*, 333 N.L.R.B. 367, 367 (2001) (leaving issue of reinstatement and back pay to compliance hearing, where respondent "will have the burden of establishing that [an employee] engaged in misconduct for which it would have discharged any employee").

### IV

We conclude that substantial evidence supports the findings of the Board that AutoNation challenges here: that its comments through Davis and Andrews at the August 23, 2011, meeting violated Section 8(a)(1) of the Act, and that Huerta's termination violated Sections 8(a)(3) and (1). We therefore ENFORCE the decision of the Board.