In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-1354 & 15-1582

STAFFING NETWORK HOLDINGS, LLC,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
No. 13-CA-105031

ARGUED NOVEMBER 5, 2015 — DECIDED MARCH 2, 2016

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* The National Labor Relations Board ("NLRB" or "Board") concluded that Staffing Network Holdings, LLC ("Staffing Network") violated the National Labor Relations Act by twice threatening employees with discharge for engaging in protected, concerted activity, and for actually discharging employee Griselda Barrera for engaging in protected, concerted activity. *See* 29 U.S.C. § 151 *et seq.*

(hereafter "the Act"). The NLRB ordered Staffing Network to offer Barrera reinstatement and to make her whole for lost wages. Staffing Network petitions this court for review of that decision and asks that we reverse the Board's decision in its entirety. The NLRB cross-petitions for enforcement of its Order. We deny Staffing Network's petition for review and grant the NLRB's petition for enforcement.

## I.

Staffing Network is a staffing agency, providing temporary and long-term employees to a variety of employers. The company operates at free-standing locations and on-site at its clients' premises. ReaderLink, an Illinois company, is an on-site client that fills book orders for other businesses. At the time of the incident leading to this action, Staffing Network provided approximately eighty full-time employees for ReaderLink, including an on-site manager, a staffing assistant, pickers and stockers. Pickers at ReaderLink work side-by-side on a production line, selecting books to fill orders, placing the books in boxes and sending them down the line. Stockers ensure that pickers have an adequate supply of books to fill the orders. Barrera began working for Staffing Network in 2004, and was placed at ReaderLink as a picker. Except for once punching the clock too early for her shift, Barrera worked at ReaderLink for eight years without incident. Staffing Network's on-site manager at ReaderLink was Andy Vega, who had been working for the company for only a few months at the time of these events. Monica Amaya worked as Vega's staffing assistant. ReaderLink also had its own in-house supervisors, including Mari Perez.

On November 15, 2012, ReaderLink was working to fill an especially large book order. At some point in the day, Perez told Vega that two of the stockers were not working quickly enough. Vega asked both stockers to work more quickly, but one of the workers, a man named Juan, said that he would work no faster for $8.25 an hour. Perez told Vega to send Juan home and Vega complied. Juan's dismissal caused an immediate reaction among the pickers, including Barrera, Olga Gutierrez and other women. They asked why Juan had been sent home, and they told Vega that Juan could not keep up with the line because he was new at the job. Vega replied that Juan was sent home because of his attitude as well as his inability to keep up with the work. Barrera, Gutierrez and others told Vega that this was not fair. Vega replied that it was not the pickers' matter to deal with and that they should get back to work. Vega also said that he could send them home as well for their attitude. He then left the area.

Vega returned a short time later. He angrily and repeatedly asked Barrera if everything was fine and told her again that he could send her home if she had an issue. Barrera asked Vega if he was threatening her and said that she could send a letter to the Department of Human Rights. Vega then told Barrera to collect her things and go home. Barrera refused, insisting that she had done nothing wrong. Vega became angrier, pointed at Barrera and said in a raised voice, "Let's see if you're not leaving." Gutierrez and others came to Barrera's defense, saying she had done nothing wrong. Vega again left the area and returned to his office.

Vega then directed Amaya to tell Barrera to go home. Amaya went to the production line and told Barrera to take her

personal items and leave. She told Barrera that if she did not leave, Vega intended to have security guards escort her out. Again, the other women came to Barrera's defense, telling Amaya that Barrera had done nothing wrong and that Vega had been rude. Amaya said there had been a lot of complaints about Vega but that there was nothing she could do. Barrera then left the work area with Amaya, turned in her radio headset that pickers used to communicate, and waited in the cafeteria for a ride to pick her up.

Amaya initially told Barrera to leave for the day. However, later in the day, Barrera sent Amaya a text message asking if she could return to work the next day. Amaya asked Vega how she should reply to the message. Amaya then sent Barrera a text message stating that Barrera needed to speak to Vega about what had happened that day, and that she should not return to work.

Having been told to leave and not come back, Barrera reasonably surmised that she had been terminated and she applied for unemployment benefits. The Illinois Department of Employment Security ("IDES") sent a request for information about Barrera's claim to Staffing Network. Vega and Amaya composed and sent Staffing Network's reply to the State. The IDES form requested that the employer provide the claimant's "current status with your company, including details." The form presented four possible statuses: (1) Lack of Work (with sub-categories of Permanent or Temporary); (2) Voluntary Separation; (3) Involuntary Separation; and (4) Still Working. Vega and Amaya checked the box for "Involuntary Separation." For Involuntary Separation, the form requested that the employer "[p]rovide reason, policy violation (include policy

section), dates and details of prior warnings, and written documentation of the final incident details. Include the name & title of the individual who terminated the claimant." Vega and Amaya replied:

> On 11-15-2012 the client (Mari Perez) informed me that a stacker [sic] was not working at the level he should be. When told to speed it up a bit Griselda Barrera took it upon herself to tell the onsite manager that he doesn't know what he's talking about and that he should do his homework. After this Griselda Barrera went to the rest room for about 10 min [and] when she returned she was talking to some of the ladies in the line disrupting the production. Mari Perez told the on site manager to tell Griselda Barrera if she does not want to work to punch out and go home. To which her reply to Andy Vega (on site) was "do not threaten me with nonsense, I have been here for many years and I know my rights! And you are nobody to tell me what to do," [sic] After this she was told to punch out and go home for the day but she ignored the request and continued to get the ladies in the line worked up saying this was going against the law and that they have to stand up against all the injustice we are committing.
>
> Due to this Griselda Barrera cannot return to ReaderLink.

Ex. R-8.

In response to questions specific to the staffing industry, Vega and Amaya also indicated on the form that Barrera would "be considered for future assignments with your agency," stating, "Yes, with any account other than ReaderLink. She may call other branches for work." In response to a question regarding whether there had been any "job refusals since the last assignment ended that have not been reported," Vega and Amaya replied, "No she has not been called due to her being placed on DNR from this account." In this context, "DNR" means "Do Not Return," a status given to a Staffing Network employee when a particular client requests that the employee not return to the client's work site. The State ultimately approved Barrera's unemployment benefits. Staffing Network never told Barrera that she had not been terminated. Nor did the company tell her that she could return to work at ReaderLink or that she could work at an alternate location. After the termination, Barrera tried to meet with a representative of ReaderLink's human resources department directly. But when Barrera visited ReaderLink and asked to speak to a ReaderLink employee, Vega and Amaya met her instead and told her the ReaderLink employee was unavailable.

Barrera filed an unfair labor practice charge, and the Board's General Counsel issued a complaint alleging that Staffing Network violated section 158(a)(1) of the Act by twice threatening to discharge employees for engaging in protected, concerted activity, and by actually discharging Barrera because of her protected, concerted activity. An Administrative Law Judge ("ALJ") held a hearing at which both the General Counsel and Staffing Network presented witnesses and

entered documentary evidence. The ALJ determined the facts as we have recited them above, generally crediting the General Counsel's witnesses and finding that Staffing Network's witnesses were either partly or entirely not credible. The ALJ agreed that Staffing Network violated section 158(a)(1) as alleged by the Board. The ALJ rejected the company's claims that Barrera was not terminated, or that if she was terminated, the discharge was justified by Barrera's insubordinate behavior. The ALJ further found that Barrera did not lose the protection of the Act under the factors delineated in *Atlantic Steel Co.*, 245 N.L.R.B. 814 (1979). Finally, the ALJ determined that a burden-shifting analysis under *Wright Line*, 251 N.L.R.B. 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981), was not necessary but that a violation would be found under *Wright Line* if the case applied.

As a remedy, the ALJ ordered that Staffing Network offer reinstatement to Barrera and make her whole for lost earnings and benefits. The ALJ further ordered that Staffing Network cease and desist from threatening to discharge or discharging employees for engaging in protected, concerted activity. The ALJ also directed the company to post a notice in both English and Spanish informing workers of their rights and summarizing the outcome of the proceedings. On appeal, the Board affirmed the ALJ's rulings, findings, and conclusions and adopted the ALJ's Order with slight modifications that are not relevant to this appeal. Staffing Network then petitioned this court for review of the Board's decision, and the Board cross-petitioned for enforcement of its Order.

## II.

In its petition for review, Staffing Network asserts that (1) the Board erred in finding that the company terminated Barrera; (2) in the alternative, if the Board was correct that Barrera was terminated, the Board erred in concluding that Staffing Network was prohibited by the Act from terminating Barrera; (3) the Board erred in concluding that the company unlawfully threatened employees twice on November 15, 2012; and (4) the Board erred in crediting the testimony of all of the General Counsel's witnesses and discrediting all of Staffing Network's witnesses. Our review of the Board's findings is deferential, assessing only whether they are supported by substantial evidence on the record considered as a whole. *N.L.R.B. v. Enterprise Ass'n of Pipefitters Local 638*, 429 U.S. 507, 531 (1977); *AutoNation, Inc. v. N.L.R.B.*, 801 F.3d 767, 771 (7th Cir. 2015); 29 U.S.C. § 160(f) ("the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall … be conclusive."). *See also Big Ridge, Inc. v. N.L.R.B.*, 808 F.3d 705, 713 (7th Cir. 2015) (we will affirm and enforce the Board's findings if they are supported by substantial evidence and if the Board's conclusions have a reasonable basis in law). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York, Inc. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). *See also AutoNation*, 801 F.3d at 771.

**A.**

We begin with Staffing Network's claim that the company never terminated Barrera. According to the company, no Staffing Network employee ever told Barrera that her employment was terminated and Barrera, at the time of briefing, remained an active employee in the company's database. Staffing Network also asserts that the Board misunderstood the nature of the company's business as a staffing agency, and that an inability to be placed at a particular client such as ReaderLink was not an indication that Barrera was terminated from Staffing Network. Rather, she could be placed at other employers. The company also faults the Board for relying on a "phantom" text message from Amaya to Barrera, purporting to tell Barrera not to return to work. Staffing Network contends that the Board ignored undisputed evidence that Barrera has never been terminated.

None of these assertions has any merit and we easily conclude that the Board's determination that Barrera was terminated was supported by substantial evidence. Indeed, in light of the smoking-gun admission that the company made in response to the State of Illinois' unemployment inquiries, Staffing Network's claim that it did not terminate Barrera is frivolous. As we noted above, in its response to the State, the company indicated that Barrera's status *with Staffing Network* (as opposed to ReaderLink) was an "involuntary separation." Staffing Network did not check the box on the form indicating that Barrera was "still working," or even the box for "voluntary separation," even though it now claims both that Barrera is still employed and also that Barrera simply abandoned her job. In fact, Staffing Network did not attempt to explain this

conclusive admission at the hearing before the ALJ or in its briefing in this court, even though the ALJ relied on it and the Board also cited it. Asked at oral argument about this singularly damning piece of evidence, Staffing Network's counsel responded:

> The person who filled out the IDES form, according to the testimony, was not a lawyer. He filled it out as best he could. He put information in there that conveyed that the person could not return to ReaderLink but also was eligible for assignments. Someone who is eligible for assignments is not separated from Staffing Network. They are active in the system and able to go on other assignments.

R. 31, at 2:47. A manager need not be a lawyer to know whether an employee has been terminated or simply sent home for the day.

Moreover, this interpretation of the document is unsupported by the facts as determined by the ALJ and affirmed by the Board. As we noted, Vega did not check boxes indicating that Barrera was "still working" or that her separation was "voluntary." He checked the box for "involuntary separation" from Staffing Network. That Vega is not a lawyer (a fact also not contained in the record but we see no reason to doubt counsel on this point) does not explain why he indicated an involuntary separation when the company really meant there had been no separation at all. Having made this conclusive admission in a document filed with the State, Staffing Network could have asked Vega to explain his answer, and Vega was

free to clarify that he meant only that Barrera could not return to ReaderLink, not that she had been involuntarily terminated from Staffing Network. But Vega never clarified why he checked the "involuntary separation" box in response to the State's inquiry. There is no evidence in the record supporting counsel's claim on appeal that checking the box for "involuntary separation" meant something other than involuntary separation from Staffing Network.[1] The ALJ was justified in relying on this admission in concluding that Barrera had been terminated from the company, and this document alone provides substantial evidence supporting the conclusion that Barrera was terminated by Staffing Network.

But in addition to the company's response to the State indicating involuntary separation, other evidence supported the Board's determination that Barrera had been terminated. Barrera testified that Amaya told her, at first, to go home for the day (under threat of a security escort). After Barrera heard from a co-worker that Vega told another co-worker that

---

[1] Staffing Network relies on other parts of the company's IDES response to contend that Barrera was not terminated from Staffing Network but simply could not return to ReaderLink. For example, on the IDES form, Vega indicated that Barrera could not return to ReaderLink, and in the section devoted to "questions [that] are specific to your industry," Vega stated that Barrera would "be considered for future assignments" "with any other account than Readerlink [sic]." The ALJ found that this statement indicated that Barrera was eligible for rehire. Nothing in the company's IDES response undermines the ALJ's conclusion that Barrera was terminated from Staffing Network and also was eligible for rehire.

Barrera no longer worked at Staffing Network,[2] Barrera sent a text message to Amaya asking if she could return to work the next day. Amaya indicated in her reply to Barrera that Vega wanted to talk to Barrera the next day "but it wasn't for me to go back to work." Tr. at 26. Having been told to go home and to not come back, Barrera did not return to work, and instead applied for unemployment benefits. *See AutoNation*, 801 F.3d at 776-77 (finding employer's claim that it fired employee due to job abandonment to be a pretext because employer knew that employee had filed for unemployment benefits and was under the impression that he had already been terminated and yet the company did nothing to correct the employee's alleged misimpression). On the question of termination, the ALJ credited Barrera's version of events.[3] That version of events

---

[2] The ALJ allowed Barrera to testify to this double-hearsay not for the truth of the matter asserted but simply to show why Barrera sent a text message to Amaya inquiring about her status. Like the ALJ, we do not credit the truth of the co-worker's assertion that Vega told another worker that Barrera no longer worked at Staffing Network. The evidence is relevant only to demonstrate why Barrera sought clarification of her status.

[3] The ALJ discredited Vega's testimony about his response to Barrera's text message to Amaya because Vega's testimony conflicted with Amaya's version of events and was also contradicted by Vega's own testimony regarding whether Barrera could return to ReaderLink the next day. In particular, the ALJ rejected Vega's claim that Barrera was directed to return to ReaderLink the next day because Vega also testified that Barrera could not return to ReaderLink because she was on "DNR" status, a fact he confirmed with the State as well. To the extent that Staffing Network asserts that a DNR with a particular client was not a separation from Staffing Network, that claim is belied by the company's admissions to the State of

(continued...)

provides substantial evidence to support the conclusion that Staffing Network terminated Barrera.

## B.

Staffing Network's remaining arguments are all founded on a version of the facts that was thoroughly rejected by the ALJ. Under the company's version of events, Vega did not fire Barrera; he simply sent her home for the day after she had been insubordinate and abusive towards him. When Vega sent Juan home at the request of ReaderLink's management, Barrera refused to go back to work, called Vega "a nobody," threatened to report him to immigration authorities, and told him he was just Amaya's "secretary," according to Staffing Network. Vega denied yelling at Barrera or pointing at her, and claimed that he sent her home not because she was complaining about "injustice" but because she had been abusive and insubordinate, causing him embarrassment in front of other employees. Under Staffing Network's version, no one ever told Barrera she could not return to work, and in fact Amaya told her to return the next day. The company also asserted that Barrera's adult son repeatedly called Vega's cell phone and left threatening and harassing voice mails. Staffing Network asserts that it repeatedly attempted to meet with Barrera but that she rebuffed all attempts to communicate. Staffing Network also claims that ReaderLink alone made the decision to place Barrera on "do not return" status.

---

[3] (...continued)
Illinois that Barrera was involuntarily separated from Staffing Network.

But this version of events was almost completely rejected by the ALJ. Based on this discredited version of events, Staffing Network asserts (1) that the Board erred in finding that the termination violated the Act; (2) that the Board was mistaken in concluding that the company unlawfully threatened employees twice on November 15, 2012; and (3) that the Board wrongly credited the testimony of all of the General Counsel's witnesses while discrediting all of Staffing Network's witnesses. Because the ALJ's findings were based in large part on concluding that Barrera and the General Counsel's other witnesses were credible, and that Vega and Staffing Network's witnesses were not, we begin with the company's complaint that the Board erred in reaching its credibility findings.

We must defer to the Board's credibility determinations and will disturb them only in extraordinary circumstances. *Big Ridge*, 808 F.3d at 715; *Jet Star, Inc. v. N.L.R.B.*, 209 F.3d 671, 676 (7th Cir. 2000). The category of "extraordinary circumstances" includes a clear showing of bias by the ALJ, an utter disregard for uncontroverted sworn testimony, and the acceptance of testimony to a fact that would be physically impossible. *Jet Star*, 209 F.3d at 676; *J.C. Penney Co. v. N.L.R.B.*, 123 F.3d 988, 995 (7th Cir. 1997); *Carry Companies of Ill., Inc. v. N.L.R.B.*, 30 F.3d 922, 928 (7th Cir. 1994). "The judge on the front line is in the best position to determine which of two stories told by competing witnesses should be credited." *N.L.R.B. v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1313 (7th Cir. 1998). That is so because credibility is "a function not only of what a witness says but of how a witness says it." *N.L.R.B. v. Overnite Transp. Co.*, 938 F.2d 815, 819 (7th Cir. 1991). Moreover, an ALJ does not necessarily exhibit bias when crediting all of the witnesses

on one side of a dispute and none of the witnesses on the other. *N.L.R.B. v. Q-1 Motor Express, Inc.*, 25 F.3d 473, 479 (7th Cir. 1994). *See also N.L.R.B. v. Pittsburgh S.S. Co.*, 337 U.S. 656, 659 (1949) ("total rejection of an opposed view cannot of itself impugn the integrity of competence of a trier of fact").

Staffing Network points to nothing in the record that would demonstrate the extraordinary circumstances necessary to set aside the credibility determinations here. The ALJ carefully considered the testimony of all of the witnesses and assessed the demeanor and credibility of each witness. The ALJ discredited Vega's testimony based on his demeanor when testifying, the "self-serving," "illogical," "rambling and narrative" nature of his testimony, and the contradictory testimony of other witnesses, including witnesses also employed by Staffing Network. For example, the ALJ discredited Vega's testimony in part because it conflicted with the testimony of Amaya, his assistant and a Staffing Network employee. Vega's testimony was also contradicted by the written record including Vega's own written statements to the State of Illinois. At times, Vega's testimony was also internally inconsistent. For example, Vega testified both that he told Barrera to come back to work at ReaderLink the next day and that ReaderLink had placed her on "do not return" status. These are valid reasons to reject Vega's testimony and to find that he was not credible.

In contrast, the ALJ found the testimony of Barrera to be "both believable and reliable," noting that she had testified "in a steady and forthright manner," and that her testimony was corroborated by other witnesses. The ALJ also found her testimony to be "logical and consistent" for the most part. On a few minor points, the ALJ did not credit Barrera's testimony

to the extent that it contradicted an earlier affidavit. Again, these are valid reasons to find a witness credible and there is no hint of bias in the ALJ's decision and order much less "extraordinary circumstances" that would cause us to disturb credibility findings.

Accepting the ALJ's factual findings (which were in turn affirmed by the Board), the only remaining question is whether those facts lend substantial evidence to the Board's finding that the company wrongfully terminated Barrera, and the Board's conclusion that the company twice threatened employees with discharge for engaging in protected, concerted activity. The Act provides, in relevant part, that employees have the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. Employers may not "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157" of the Act. 29 U.S.C. § 158(a)(1). An employer violates section 158(a)(1) when it threatens employees with discipline or discharge for engaging in concerted activity that is protected under section 157. *Fleming Companies, Inc. v. N.L.R.B.*, 349 F.3d 968, 973 (7th Cir. 2003). Threats of discharge, discipline, other reprisals against employees for engaging in union activity violate the Act because "these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *Fleming Companies*, 349 F.3d at 973. The tendency to coerce is judged from the viewpoint of the employee. *N.L.R.B. v. Champion Labs., Inc.*, 99 F.3d 223, 228 (7th Cir. 1996); *N.L.R.B. v. Gold Standard*

*Enters., Inc.*, 679 F.2d 673, 676 (7th Cir. 1982). We easily conclude that the Board's findings are supported by substantial evidence.

As was the case with the question of termination, the company's response to the State's unemployment inquiry provides a veritable smoking gun on the issue of the reason for Barrera's termination. Asked to provide the reason for Barrera's involuntary separation, Staffing Network explained that after a stocker was told to speed up his work, Barrera objected and then began "talking to some of the ladies in the line disrupting the production." According to Vega's own description of events, after he told Barrera to punch out and go home "if she does not want to work," Barrera "ignored the request and continued to get the ladies in the line worked up saying this was going against the law and that they have to stand up against all the injustice we are committing. Due to this, Griselda Barrera cannot return to ReaderLink." With this response to the State, the company essentially admitted the relevant facts supporting the ALJ's conclusion. It is well settled that a brief, on-the-job work-stoppage is a form of economic pressure entitled to protection under the Act. *Molon Motor & Coil Corp. v. N.L.R.B.*, 965 F.2d 523, 525 (7th Cir. 1992). That is the type of action that Vega described in his response to the State in justifying Barrera's discharge. Witness testimony also supported the finding that Staffing Network terminated Barrera because of her concerted, protected activity in protesting Vega's treatment of Juan in relation to the terms and conditions of his employment and that of the pickers. Namely, Barrera and Gutierrez both testified that Vega told Barrera to leave because she and the other pickers protested Vega's unfair

treatment of Juan. Therefore, substantial evidence supports the Board's finding that the company violated the Act when it discharged Barrera for engaging in protected, concerted activity.

Substantial evidence also supports the Board's finding that Vega twice threatened workers with discharge for engaging in protected, concerted activity. As we have noted, the pickers' temporary work stoppage and complaints to Vega regarding his treatment of Juan constituted protected, concerted activity. According to the testimony of both Barrera and Gutierrez, Vega told the workers to get back to work, said that what happened to Juan was not the pickers' matter to deal with, and threatened that he would send the workers home for their attitude if they did not comply. And both Barrera and Gutierrez testified that Vega made a second threat to Barrera, telling her he would send her home after repeatedly and angrily asking her if she was fine. Of course, Vega then carried through on that threat when he terminated Barrera moments after delivering the threat. The ALJ determined that Vega's statements had a tendency to coerce workers who were engaged in protected, concerted activity. The testimony of Barrera and Gutierrez supplied substantial evidence to support that finding.

## III.

Staffing Network's remaining arguments are unavailing. In light of the deference we owe to the fact-findings of the Board, we conclude that the Board's findings are supported by substantial evidence. We therefore deny Staffing Network's petition for review and we ENFORCE the decision of the Board.