In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-1046, 15-1103

BIG RIDGE, INC.,

*Petitioner-Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner*.

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
Nos. 14-CA-30379, 14-CA-30406, 14-RC-12824

ARGUED NOVEMBER 5, 2015 — DECIDED DECEMBER 18, 2015

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. In 2012, the National Labor Relations Board ("the Board") found that Big Ridge, Inc. violated the National Labor Relations Act, 29 U.S.C. § 158 ("the Act"). Big Ridge threatened employees with mine closure and job loss based on their support of the union and discharged employee Wade Waller because of his union support. Big Ridge petitioned this Court for review, and the appeal turned on

the Board's authority to issue its order. We vacated the Board's order, finding that the Board lacked a quorum because three of the Board's five members were improperly appointed under the Recess Appointments Clause of the Constitution. In 2014, a validly constituted Board considered the case anew and again found that Big Ridge violated the Act. Big Ridge filed a petition for review, arguing that the Board lacked jurisdiction to issue the 2014 order and that even if the Board did have jurisdiction, the Board erred in holding that Big Ridge violated the Act by discharging Waller. The Board filed a cross-application to enforce its order. We deny Big Ridge's petition for review and grant the Board's cross-application for enforcement of its order.

## I. Background

### A. The United Mineworkers of America Election

Big Ridge, Inc. operated the Willow Lake coal mine in Equality, Illinois. In March 2011, the United Mineworkers of America ("UMWA") began organizing at Willow Lake to represent the production and maintenance employees. Willow Lake had previously been unionized, but the old union disclaimed interest in the bargaining unit in 2011. UMWA petitioned the National Labor Relations Board for an election, and in response, Big Ridge began an antiunion campaign. Big Ridge supervisors threatened employees with mine closure and job loss if they chose union representation and promised benefits if they opposed UMWA. An election was held on May 19 and 20, 2011, and UMWA was successful.

Big Ridge objected to the election results, alleging that UMWA "intimidated, restrained, and/or coerced eligible

employees, rendering their free choice impossible." In support of these allegations, Big Ridge cited two alleged threats by Wade Waller, a miner at Willow Lake and an ardent union supporter, as well as alleged threats by other employees.

### B. Waller's Behavior

Waller worked at Willow Lake for more than seven years prior to his discharge. As a ram car driver, he transported coal underground in a heavy ram car and dumped the coal onto a feeder, where a conveyer would lift the coal to the surface of the mine for processing. Waller openly supported UMWA, wearing union paraphernalia and singing about his dislike of "scabs" (a derogatory term for persons who oppose unions).

Ronald Koerner worked as a feeder-watcher. His responsibilities included directing ram car traffic to ensure miner safety and monitoring the feeder to prevent a coal overload. Feeder-watchers used helmet lights, radios, and horns to "flag," or communicate with, ram car drivers. The feeder-watcher position was created in compliance with an order from the Mine Safety and Health Administration after a miner had been run over and killed by a ram car at Willow Lake in 2010.

On May 20, 2011, the second day of the UMWA election, Waller and Koerner had a disagreement over one of Koerner's signals. Waller had parked his ram car at the feeder and was dumping coal when Koerner flagged Waller, indicating that he should stop dumping coal onto the feeder. Waller ignored the signal, saying that "he wouldn't stop for nothing." Koerner allegedly felt threatened by Waller's behavior, fearing that Waller would run him over with the ram

car. Koerner reported the incident to Shift Leader Eric Davis, who reported the incident to Mine Manager Scott Lawrence. The next day, Lawrence reassigned Koerner to a different position.

Waller also had a dispute with employee Issac Craig after UMWA won the election. Craig posted on Facebook that he was displeased with the election results. Waller confronted Craig about the Facebook post and threatened to "beat [Craig's] ass." Mine Manager Lawrence spoke to Craig about Waller and later spoke with Waller about his behavior. Waller admitted to threatening Craig but denied threatening to run anyone over with a ram car. Lawrence told Waller to leave Craig alone, and he also agreed to let Waller work additional shifts.

Big Ridge has a history of tolerating verbal threats and physical confrontations. Employees used profanity and vulgar language daily, and Big Ridge never prohibited this type of behavior or discharged employees for such conduct absent significant physical contact. For example, in 2010, an employee admitted to threatening to shoot a coworker but was never disciplined. In 2011, another employee told a coworker he would "beat [his] guts out." A Section Foreman witnessed this incident, but no disciplinary action was taken. Additionally, even when employees and supervisors engaged in physical confrontations, Big Ridge either did not discipline them or merely issued three-day suspensions. For example, in 2011, Big Ridge suspended two employees for grabbing and shoving coworkers.

### C. Waller's Discharge

On May 21, 2011 in preparation for filing election objections challenging UMWA's victory, Big Ridge began collecting employee and supervisor statements about alleged election-related misconduct. During this time period, Senior Human Resources Manager Robert Gossman also collected written statements about recent incidents involving Waller. The statements described Waller's confrontations with Koerner and Craig as well as an incident in which Waller allegedly went into the bathhouse and yelled, "fuck all you fucking scabs!" An employee also gave a statement saying that Waller threatened him two weeks before the election by saying, "you better vote UMWA or a scab like you won't work here," but the administrative law judge ("ALJ") found that Big Ridge failed to establish by a preponderance of the evidence that this threat occurred.

Gossman discussed his findings with Thomas Benner, Vice President of Underground Operations in the Midwest. Benner authorized Gossman to discharge Waller, instructing him to first offer Waller an opportunity to deny or explain the allegations. Prior to meeting with Waller, Gossman drafted a termination letter. On May 27, one week after the election, Gossman interviewed Waller. Waller denied threatening Koerner, yelling "fuck all you scabs" in the bathhouse, and telling an employee "you better vote UMWA or a scab like you won't work here anymore." Gossman then terminated Waller's employment with Big Ridge. Prior to his discharge, Waller had not been disciplined for any infraction during his seven years of employment with the company.

### D. Procedural Background

On May 26, 2011 Big Ridge filed objections to the election results, seeking a rerun election. Shortly thereafter, UMWA filed unfair labor practice charges against Big Ridge. In response, the Board issued a complaint alleging numerous violations of §§ 8(a)(1) and 8(a)(3) of the Act. The Board consolidated the cases and directed a hearing.

After a hearing, the ALJ issued a decision and recommended order. The ALJ determined that Big Ridge's election objections should be overruled and that UMWA should be certified as Big Ridge employees' exclusive bargaining representative. The judge further found that Big Ridge violated § 8(a)(1) by threatening employees with mine closure, job loss, and other unspecified reprisals because of their union support and by promising benefits to employees for opposing UMWA. The judge also found that Big Ridge violated §§ 8(a)(1) and 8(a)(3) by discharging Waller because of his union support. The Board agreed and issued an order ("the 2012 Decision and Order") affirming the ALJ's decision and adopting his recommended order.

Following the 2012 Decision and Order, Big Ridge petitioned for review and the Board cross-applied to this Court for enforcement of the order. Big Ridge challenged the Board's authority to issue the order, arguing that the Board lacked a quorum because three of the Board's five members were improperly appointed under the Recess Appointments Clause of the Constitution. On June 26, 2014, the Supreme Court issued its decision in *N.L.R.B. v. Noel Canning*, which held that three recess appointments to the Board were invalid under the Recess Appointments Clause. 134 S. Ct. 2550, 2578 (2014). Based on this decision, we issued an order on

July 2, 2014 granting the petition for review, vacating the Board's order, and denying the cross-application of the Board for enforcement of its order. We later denied the Board's motion to remand.

In October 2014, the Board considered the case anew with a validly constituted Board. Two months later, the Board issued another decision and order ("the 2014 Decision and Order"), which incorporated by reference the 2012 Decision and Order. The Board first found that it could consider the case anew after this Court denied enforcement because "[t]he clear import of the court's denial of enforcement, along with the Supreme Court's *Noel Canning* decision, is that no validly constituted Board has ruled on [the merits of the case]." The Board then considered the case de novo and adopted the ALJ's recommended order, finding that Big Ridge violated §§ 8(a)(1) and 8(a)(3). The 2014 Decision and Order requires Big Ridge to cease and desist from unfair labor practices, to make Waller whole for any lost earnings or other benefits, and to compensate Waller for any excess federal and state income taxes he may owe as a result of receiving a lump sum back pay award.[1]

Big Ridge filed a petition for review, arguing that the Board lacked jurisdiction to issue the 2014 Decision and Order and that even if the Board did have jurisdiction, the Board erred in holding that Big Ridge violated § 8(a)(3) of

---

[1] The order contains additional requirements, such as requiring Big Ridge to offer Waller full reinstatement of his former job, but those requirements are no longer relevant because the Willow Lake coal mine has since closed.

the Act by discharging Waller. The Board filed a cross-application to enforce its order.

## II. Discussion

### A. Jurisdiction

We review de novo the Board's interpretation of this Court's July 2 order vacating the Board's order for lack of a quorum. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 642 n.11 (2007) ("Agencies have no special claim to deference in their interpretation of our decisions."), *superseded by statute on other grounds*, Lilly Ledbetter Fair Pay Act of 2009, U.S. Pub. L. No. 111-2, 123 Stat. 5 (2009). After the Supreme Court's decision in *Noel Canning*, we vacated the Board's order and denied the cross-petition of the Board for enforcement because of the absence of a lawfully appointed quorum. We denied the Board's motion to remand because, at that time, there was no properly constituted Board to which we could remand the proceedings. We expected the Board to consider the case anew once it regained a quorum, just as the Eighth Circuit did in an analogous case. *See N.L.R.B. v. Whitesell Corp.*, 638 F.3d 883, 889 (8th Cir. 2011) (noting that the court "expected that the Board would visit the merits of this case again"). Thus, we hold that the Board had jurisdiction to consider the case anew with a properly constituted Board.

This decision is in conformity with the decisions of our sister circuits that have considered this issue. In *Whitesell*, the Eighth Circuit held that its prior decision denying both the Board's application for enforcement and motion to remand did "not preclude the Board, now properly constituted, from considering this matter anew and issuing its first valid deci-

sion." 638 F.3d at 889. We are also guided by the analysis of *Huntington Ingalls Inc. v. N.L.R.B.*, in which the Fourth Circuit held that the Board properly considered a case anew after the court had denied enforcement of the earlier Board order based on *Noel Canning* and had not explicitly remanded the proceedings back to the Board. —F. App'x—, No. 14-2051, 2015 WL 7423185, at *1, *3 (4th Cir. Nov. 23, 2015) (per curiam). The Fourth Circuit noted that "[a] decision finding the lack of a proper quorum clearly contemplates further Board action, and, thus, the Board here did not err when it revisited [the] challenges to the union elections." *Id.* at *3.

Big Ridge argues that under § 10(e) of the Act, the Board lacked jurisdiction to enter the 2014 Decision and Order because when a Board order is challenged in a federal appellate court, the Board loses jurisdiction over the proceeding. Under § 10(e), the Board has "power to petition any court of appeals … for the enforcement of [its orders] … ." § 10(e), 29 U.S.C. § 160(e). This section requires that after filing such a petition, the Board "shall file in the court the record in the proceedings … ." *Id.* Once the record is filed, "the jurisdiction of the court shall be exclusive and its judgment and decree shall be final … ." *Id.* In other words, Big Ridge contends that our order was a final one that deprived the Board of jurisdiction over future proceedings.

We disagree. Our July 2 order was final only with respect to the matter we actually decided: that the Board lacked a "lawfully appointed quorum" when it issued the 2012 Decision and Order. *See Whitesell*, 638 F.3d at 889; *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1478 (Fed. Cir. 1998) (noting the general rule that "an appellate mandate governs only that which was actually decided"). Since we

based our July 2 order denying enforcement only on the Supreme Court's *Noel Canning* decision, we did not reach the merits of the unfair labor practices issue. Thus, the Board was not precluded from conducting further proceedings and having a properly constituted Board decide the case on the merits. Additionally, we note that construing our July 2 order as precluding further Board proceedings would result in injustice because the parties would never receive a decision by a properly constituted Board. *See Bailey v. Henslee*, 309 F.2d 840, 844 (8th Cir. 1962) (noting that a "mandate is to be interpreted reasonably and not in a manner to do injustice" (internal citation and quotation marks omitted)).

Big Ridge relies on several cases to support its argument that the Board lacked jurisdiction to consider the case anew. However, all of these cases can be distinguished because they deal with appellate court rulings on the merits, whereas *Whitesell*, *Huntington Ingalls*, and the case at hand involve denials of enforcement due to lack of a quorum. For example, in *Int'l Union of Mine, Mill & Smelter Workers, Locals No. 15 v. Eagle-Picher Mining & Smelting Co.*, nearly two years after the Eighth Circuit granted enforcement of the Board's order, the Board petitioned the court to vacate the portion of its decree that dealt with the award of back pay and to remand so the Board could use a different method of calculating back pay. 325 U.S. 335, 337 (1945). The Supreme Court held that the Board could not recall the proceeding from the court and "start afresh as if the enforcement decree had never been entered." *Id.* at 340. The scenario before us now is very different from that of *Eagle-Picher.* We did not decree enforcement of the Board's order, but rather vacated the order because of the absence of a lawfully appointed quorum. Unlike in *Eagle-Picher,* the Board here did not try to alter an en-

forcement decree that was already final. Instead, it properly ruled on the merits of the case for the first time. *Cf. N.L.R.B. v. Lundy Packing Co.*, 81 F.3d 25, 26 (4th Cir. 1996) (holding that after the court denied the Board's petition for enforcement on the merits, the Board could not reopen the case absent a remand); *W.L. Miller Co. v. N.L.R.B.*, 988 F.2d 834, 837 (8th Cir. 1993) (holding that the Board did not have jurisdiction to impose a remedy which went beyond that in its original order after the Eighth Circuit had already enforced the Board's order).

We now address the merits of the Board's decision for the first time.

### B. Merits

Big Ridge does not challenge the § 8(a)(1) violations found by the Board, including threats of mine closure and job loss for supporting the union. Thus, the Board is entitled to summary affirmance and enforcement of these uncontested parts of its order. *See* § 10(e) ("No objection that has not been urged before the Board … shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *N.L.R.B. v. Somerville Constr. Co.*, 206 F.3d 752, 756 (7th Cir. 2000) (summarily enforcing the Board's order since the company "never filed any exceptions with the [Board] concerning the ALJ's finding"). These uncontested violations also "color our analysis of [Waller]'s discharge." *Uniroyal Tech. Corp. v. N.L.R.B.*, 151 F.3d 666, 667–68 (7th Cir. 1998) ("[A] company that does not dispute its responsibility for multiple prohibited practices is more likely to have engaged in an additional one than a company which has not been found to have engaged in any other prohibited practice.").

Big Ridge argues that the Board erred in holding that the company violated § 8(a)(3) of the Act by discharging Waller because of his union support. According to Big Ridge, the company discharged Waller because his threatening conduct presented serious safety concerns.

Sections 8(a)(1) and 8(a)(3) protect the rights in § 7 of the Act. Section 7 guarantees employees the right to "form, join, or assist labor organizations … for the purpose of collective bargaining … ." § 7, 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of the rights guaranteed under § 7 of the Act. Section 8(a)(3) further safeguards these rights by making it an unfair labor practice for an employer to use employment discrimination "to encourage or discourage membership in any labor organization … ." Thus, an employer violates §§ 8(a)(1) and 8(a)(3) by discharging an employee because of his union activity. *See FedEx Freight East, Inc. v. N.L.R.B.*, 431 F.3d 1019, 1025 (7th Cir. 2005).

We will enforce the Board's order finding that Big Ridge violated § 8(a)(3) by discharging Waller if the Board's "factual findings are supported by substantial evidence and its conclusions have a reasonable basis in the law." *Id.* (citation omitted); *see also* § 10(e). Where the Board adopts the ALJ's findings of facts and conclusions of law, we review the ALJ's determinations. *FedEx Freight East*, 431 F.3d at 1026. "Discerning an employer's motivation is a question of fact," so we apply the substantial evidence test. *Rochelle Waste Disposal, LLC v. N.L.R.B.*, 673 F.3d 587, 597 (7th Cir. 2012). "The substantial evidence test requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but

merely the degree that *could* satisfy the reasonable fact find-
er." *Id*. at 592 (citation and internal quotation marks omit-
ted).

To evaluate an employer's motivation in unlawful dis-
crimination cases, this Court has adopted the two-step ana-
lytical framework set forth in *N.L.R.B. v. Wright Line v. Lam-
oureux*, 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st
Cir. 1981). *See, e.g., FedEx Freight East*, 431 F.3d at 1025 (ap-
plying the *Wright Line* test); *Int'l Union of Operating Engineers,
Local 150 v. N.L.R.B.*, 325 F.3d 818, 831–32 (7th Cir. 2003)
(same). Under *Wright Line*, the first step is to consider
whether the Board has shown that antiunion animus was a
substantial or motivating factor in the discharge. *Int'l Union
of Operating Engineers,* 325 F.3d at 826 n.11. To make such a
showing, the Board must prove, by a preponderance of the
evidence, that "(1) the employee engaged in a protected ac-
tivity; (2) the decisonmaker knew it; and (3) the employer
acted because of antiunion animus." *FedEx Freight East*, 431
F.3d at 1025 (quoting *Ryder Truck Rental v. N.L.R.B*, 401 F.3d
815, 825 (7th Cir. 2005) (internal quotation marks omitted)).

Once the Board makes the requisite showing for step one
of the *Wright Line* analysis, we turn to step two: The burden
shifts to the company to "either rebut that evidence or
mount an affirmative defense that the company would have
taken the same action despite the employee's protected activ-
ities." *Id.* at 1025 (citation and internal quotation marks omit-
ted). "[A]n employer's explanation need not be accepted if
there is a reasonable basis for believing it furnished the ex-
cuse rather than the reason for [the] retaliatory action."
*Justak Bros. & Co., Inc. v. N.L.R.B.*, 664 F.2d 1074, 1077 (7th Cir.
1981) (citation and internal quotation marks omitted).

1. Wright Line *Step 1: Antiunion Animus Was A Motivating Factor in the Discharge*

Three factors support the Board and ALJ's finding that antiunion animus motivated Waller's discharge. First, it is undisputed that Waller engaged in protected activity by openly and actively supporting UMWA. He frequently wore a UMWA shirt to and from work, put UMWA stickers on his hardhat, distributed UMWA stickers to other employees, and wrote and sang a derogatory song about those who opposed the union. Thus, substantial evidence supports the Board and ALJ's determination that Waller was an outspoken union supporter.

Second, there is substantial evidence supporting the Board and ALJ's conclusion that Gossman and Benner, the decisonmakers for Waller's discharge, were aware of Waller's union support prior to terminating him. Big Ridge's preelection polls, which Gossman kept in his desk, identified Waller as prounion, and Gossman collected several statements regarding Waller's union conduct and reviewed them with Benner. Benner also admitted that he was aware of Waller's union support.

Third, Big Ridge's antiunion animus is well established by the record. Big Ridge does not challenge the Board and ALJ's determination that the company violated § 8(a)(1) by threatening employees with mine closure and job loss if they chose union representation and promising benefits if they opposed UMWA. Big Ridge argues that the Board and ALJ did not make any finding that Gossman and Benner specifically harbored antiunion animus. However, even without this specific finding, there is substantial circumstantial evidence that Big Ridge's antiunion animus motivated the deci-

sion to discharge Waller. *See Van Vlerah Mech., Inc. v. N.L.R.B.*, 130 F.3d 1258, 1264 (7th Cir. 1997) (noting that the Board is entitled to rely on inferences drawn from circumstantial evidence).

The timing of Waller's discharge and his past performance at the mine support a finding of antiunion motivation. Big Ridge terminated Waller the day after it filed its objections to the election and several days after Gossman collected statements describing Waller's alleged confrontations with other employees about supporting the union. During his seven years of employment at the company, Waller had never been called into the office or disciplined. *See Uniroyal Tech. Corp.*, 151 F.3d at 668 (noting that union activist's "glowing performance reviews" and willingness to fill in on overtime shifts factored into the analysis of whether union activity was a motivating factor in discharge). The ALJ found that Waller was "by all accounts … a good employee" and that he was "hard-working, experienced, dependable, well-liked, and willing to fill in on his days off."

### 2. Wright Line *Step 2: Affirmative Defense*

Turning to the second step of the *Wright Line* analysis, the burden shifts to Big Ridge to show that it would have discharged Waller despite his union activity. Big Ridge argues that after conducting an investigation, it determined that Waller "1) had refused to stop his ram car when Koerner signaled him to do so; 2) endangered Koerner with a ram car; 3) threatened that '[Koerner] could flag him as much as [he] wants, [he's] not going to stop' and that 'he wouldn't stop for nothing;' 4) failed to follow [Big Ridge and the Mine Safety and Health Administration]-mandated safety procedures; and 5) engaged in a pattern of escalating threatening

behavior." Thus, Big Ridge claims that it had "no choice but to terminate Waller's employment." Though Big Ridge attempts to provide five distinct reasons for discharging Waller, they all relate to one incident: Waller's dispute with Koerner. The Board and ALJ properly found that this was a pretextual justification for the termination.

The Board and ALJ concluded that Big Ridge never really believed that the incident with Koerner was anything more than a routine workplace disagreement and that the incident "had nothing to do with threatening to run over or 'kill' anyone, because the car was already stopped … ." We owe particular deference to the Board's credibility determinations and will only disturb them in "extraordinary circumstances." *SCA Tissue N. Am. LLC v. N.L.R.B.*, 371 F.3d 983, 988 (7th Cir. 2004). Since Waller ignored a signal to stop dumping coal—not a signal to stop driving the ram car—he did not place Koerner in danger of being run over. Additionally, when Koerner was trained as a feeder-watcher, he was warned that some drivers would continue to dump coal even when a feeder-watcher signaled them to stop.

Big Ridge attempts to frame Waller's discharge as part of its great concern for safety after a miner was struck and killed by a ram car in 2010. However, there is substantial evidence that heated arguments in which employees threatened to physically injure each other were common and tolerated at the mine. In 2010, an employee admitted to threatening to shoot another employee yet was never disciplined. In 2011, an employee threatened another employee with physical violence in front of a Section Foreman but was not disciplined. Even when two employees engaged in physical confrontations with other employees in 2011, they were

merely suspended. Given the context of the workplace culture, substantial evidence supports the Board and ALJ's decision to reject as pretextual Big Ridge's claim that it would have discharged Waller regardless of his union activity.

Two additional facts support the rejection of Big Ridge's affirmative defense. First, after the incident between Waller and Koerner on May 20, Waller continued working in the mines and was permitted to pick up additional shifts prior to his termination on May 27. If Waller was truly seen as a threat to the miners' safety, it would have been reasonable to stop Waller from returning to the workplace immediately after the incident. Additionally, Gossman wrote Waller's termination letter before interviewing Waller about his alleged behavior, which is further evidence that Big Ridge did not thoroughly investigate the incident with Koerner before deciding to terminate Waller. *See Jet Star, Inc. v. N.L.R.B.*, 209 F.3d 671, 676–77 (7th Cir. 2000) (finding stated reason for employee's discharge—abuse of equipment—pretextual, and finding discharge motivated by antiunion animus where supervisors allowed employee to continue working after observing employee abusing company truck, other employees who damaged company trucks were not fired, and employee was never formally reprimanded for abusing the trucks and was discharged without an investigation into the reported misconduct).

Thus, under the *Wright Line* analysis, the Board has shown by a preponderance of the evidence that antiunion animus was a motivating factor in Waller's discharge, and Big Ridge has not met its burden to show that it would have discharged Waller despite his union activities.

### III. Conclusion

For the foregoing reasons, we DENY Big Ridge's petition for review and GRANT the Board's cross-application for enforcement.

MANION, *Circuit Judge*, concurring in part and dissenting in part.

I agree that the Big Ridge litigation was properly before the Board a second time, but for different reasons than the court articulates. When this case was previously before us, we issued a final judgment on July 2, 2014, vacating the Board's orders. *Big Ridge, Inc. et al. v. N.L.R.B.*, No. 12-3120, Doc. 72. Our mandate followed on August 25. Doc. 76. The mandate, which is by its nature an order directing the Board to act on the final judgment, implicitly remanded the case.

On the merits, I dissent. The Board cherry-picked the evidence supporting its theory of anti-union animus. It ignored the recent death of the miner who was crushed by a ram car, the Mine Safety and Health Administration (MSHA) directive to install feeder watchers, and the need for ram drivers like Wade Waller to follow feeder watchers' directions. The Board failed to recognize the fact that Big Ridge was trying to comply with MSHA's orders, which were designed to prevent yet another miner from being crushed by the ram cars. Instead, the Board recharacterized feeder watcher Ronald Koerner's serious concerns about Waller's statements and actions as a simple disagreement over whether the feeder would gob up. Under this reading, it was a disagreement that did not "have anything to do with 'safety.'" *Big Ridge, Inc. et al.*, 358 N.L.R.B. No. 114 (Aug. 31, 2012). To get this reading, the Board also had to ignore evidence that Waller chose to disobey all of Koerner's signals that night.

Further, the Board failed to connect its generalized findings that Big Ridge had anti-union animus with any specific finding that officials involved in disciplining and terminating Waller had animus. The Board's decision was concerned

with officials who were never involved in terminating Waller. It never indicated that the officials involved in terminating Waller were influenced at all by anti-union animus. It is not our place to create that connection and find that animus.

In short, the Board's decision lacks substantial evidence.