In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 20-1616 & 20-1701

MONDELEZ GLOBAL LLC,

*Petitioner / Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent / Cross-Petitioner,*

*and*

BAKERY, CONFECTIONARY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION, LOCAL 719, AFL-CIO,

*Intervenor-Respondent.*

Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
Nos. 22-CA-174272, 22-CA-178370, 22-CA-178591, 22-CA-180206,
22-CA 180213, 22-CA-183609, 22-CA-181423, 22-CA-179007

ARGUED JANUARY 13, 2021 — DECIDED JULY 21, 2021

Before FLAUM, BRENNAN, and SCUDDER, *Circuit Judges.*

BRENNAN, *Circuit Judge*. A union filed charges of unfair labor practices against Mondelez Global, a manufacturer of baked goods, alleging violations of the National Labor Relations Act. The National Labor Relations Board's General Counsel filed a consolidated complaint, and an administrative law judge found that the company had unlawfully discharged union officials, made unilateral changes to various conditions of employment, and failed to timely and completely provide relevant information the union requested. The Board agreed. Because substantial evidence supports the Board's decision, we deny Mondelez's petition for review and grant the Board's cross-application for enforcement.

**I**

Mondelez, an Illinois corporation, makes Ritz crackers, Oreo cookies, and other baked goods at its production plant in Fair Lawn, New Jersey.[1] Local 719—a chapter of the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union—represents the Fair Lawn plant's production workers (excluding supervisors) across several departments. Each employee is assigned a specific job classification and prohibited from working in other classifications.

Nafis Vlashi, Claudio Gutierrez, and Bruce Scherer were prominent advocates for the union. During the relevant period, Vlashi served as Local 719's president, and Gutierrez and Scherer were longtime union stewards. In these roles, they represented the interests of unionized workers, which included ensuring that they "receive their fair share of overtime" and that Mondelez does not instruct them to work in

---

[1] We draw the facts from the Board's decision and order, ALJ's decision, ALJ hearing transcript, parties' briefs, and exhibits.

classifications other than their own. As union officials, Vlashi, Gutierrez, and Scherer occasionally became embroiled in "heated disputes" with Mondelez's management and supervisors.

The relationship between Mondelez and Local 719 deteriorated during 2016. This manifested in numerous ways, including union protests, disputes about overtime, changes to terms and conditions of the collective bargaining agreement between the company and the union (the "CBA"), and the company's delayed responses to the union's information requests. Below we detail the facts of these various disputes, which show the tension between Mondelez and Local 719 that persisted throughout 2016.

## A

In 2014, Mondelez took over operations of the Fair Lawn plant from its predecessor, Kraft Foods Global, Inc.[2] In this transition, Mondelez adopted the then-existing CBA between Kraft and Local 719. After that agreement expired in February 2016, the union officials—Vlashi among them—met with the management to negotiate a successor CBA, but those discussions fell through.

In early 2016, Local 719 initiated a boycott against Mondelez for failing to reach a new agreement and for outsourcing production work abroad. Vlashi, Gutierrez, and Scherer were among those who led this effort. On one occasion, the three union officials placed American flags with the

_____

[2] As a result of a spin-off, Mondelez became the legal successor to Kraft Foods in 2014. *See Spin-Off Information*, MONDELEZ INTERNATIONAL, https://www.mondelezinternational.com/Investors/Stock/Spin-Off-Information (last visited July 19, 2021).

phrase "United We Stand" at the entrance of the employee locker rooms. Seeing this as a protest, Plant Manager Charlotta Kuratli directed the flags be taken down. The union officials complied. In February, Local 719 organized a "day of unity" to rally the unionized workers. Gutierrez and Scherer, along with other union members, emblazoned Mondelez-issued shirts with a union logo and slogan—"Local 719 BCTGM United As One Voice"—and wore them to work. Kuratli and Human Resources Manager Erica Clark-Muhammad asked the union members to remove and return the shirts. Scherer ignored this demand, and Gutierrez kept the shirt on under his sweatshirt. Then in April and May, Vlashi coordinated and spoke at four union rallies in front of the Fair Lawn plant. The union officials publicized these protest activities on Facebook.

Vlashi, Gutierrez, and Scherer clashed with Mondelez on other labor matters, too. In one instance, Mondelez hired a subcontractor to clean equipment on a Saturday. The three union officials complained to their supervisor that the Saturday clean-up work should be reserved as an overtime opportunity for the unionized workers. When the supervisor rejected this suggestion, the three union officials elevated the issue to a safety coordinator, who instructed the subcontractor to stop. And when an employee on a disability leave could not return to work after receiving medical clearance a day before, Gutierrez argued with a manager over Mondelez's unilateral change to the short-term disability leave policy.

At times, Mondelez's managers and supervisors expressed resentment towards the union. In March 2016, Mondelez assigned utility-classification employees to work on the floor. Gutierrez complained to a shift manager that those employees may not work outside their classification.

The manager ignored the complaint and allegedly told them to "leave them there because [Local 719] did not have a contract." On a separate occasion, a manager directed the packing department employees to clean up a spill in the mixing department. Scherer complained to a shift manager that the expired CBA prohibited such cross-classification assignment. That manager dismissed this complaint and stated that the union could not do anything to stop the management from assigning across classifications because Local 719 did not have a contract.

**B**

Employee overtime hours emerged as one point of contention between Mondelez and Local 719.

During this period, Mondelez provided an identification badge to each employee at its Fair Lawn plant. Employees used their individually assigned ID badges to enter the facility by swiping them on a turnstile and to clock in and out of their shifts. Those working overtime, however, did not clock in and out on their own. Instead, a supervisor manually punched them in and out of the electronic system.

In fall 2015, Rogelio Melgar, a manager, observed that the Fair Lawn plant had been incurring excessive overtime costs. He notified Kuratli, who then instructed Melgar to audit the overtime issue. Melgar first reviewed the correlation between manual "punch outs"—which he defined as when an employee leaves the facility without clocking out and a supervisor manually adjusts the payroll record—and overtime hours. He noticed a correlation between high overtime hours and high manual punch outs. As an initial attempt at lowering overtime costs, Melgar recommended only one supervisor

oversee the manual punch outs. Despite making this change, the problem continued.

Melgar began an official overtime study in May 2016. After selecting 16 random weeks from October 2015 to May 2016, Melgar prepared a report based on the following three factors: (1) the number of times a worker goes in and out of the facility; (2) payroll patterns focusing on those working more than 80 hours per week, which yielded a list of 59 employees; and (3) any discrepancies between an employee's turnstile records and payroll records (e.g., multiple exits but no re-entries by the same worker). Melgar focused on employees who had logged high overtime hours and high turnstile swipes because he believed that "a high ratio of turnstile entries of workers performing overtime work would tend to establish that those workers were not working while on overtime."

From that list, Melgar narrowed his focus to Vlashi, Gutierrez, Scherer, and two other employees.[3] Vlashi had the third highest overtime hours and sixth highest turnstile swipes; Scherer fell at the bottom of the overtime list but ranked thirteenth on the turnstile list. Oddly enough, Gutierrez appeared neither on the overtime list nor on the turnstile list. He came up in the report only because Melgar had discovered that another employee, Koroskoski, had used Gutierrez's badge to swipe out of the turnstile. And Naumoski was listed because he had the highest number of

---

[3] The two employees are Nove Koroskoski, who was ultimately terminated for using Gutierrez's timecard, and Zoran Naumoski, who had the highest turnstile-to-workdays ratio. Neither served as a union official. Koroskoski was discharged on July 1, 2016; Naumoski retired by the time Melgar completed the overtime study.

turnstile entries for the number of days worked. Based on the findings, the management concluded that these individuals falsified turnstile records, left work without authorization, and took excessive breaks.

On June 15, 2016, Human Resources Manager Clark-Muhammad individually summoned Vlashi, Gutierrez, and Scherer. She confronted each union official with allegations of time theft and turnstile-record falsification. When questioned about his turnstile discrepancies across four days in May, Vlashi maintained that he "clocked in and out at his regular time" and that "the other clock-ins and outs were done manually by a supervisor." In a separate interview with Scherer, Clark-Muhammad inquired about Scherer's turnstile discrepancies and punch outs with no corresponding turnstile swipes. Scherer confessed that he had occasionally bypassed the turnstiles when he did not have his badge but denied using other employees' badges to enter and exit the facility. Gutierrez, too, was under scrutiny. When confronted with the incident involving Koroskoski, Gutierrez denied asking his coworker to use his badge to swipe the turnstile and clock him out. The union officials later testified that their individual meetings "lasted less than 10 minutes" and that Clark-Muhammad failed to provide any opportunity to rebut the claims. Mondelez immediately suspended Vlashi, Gutierrez, and Scherer without pay.

After the investigatory interviews, Clark-Muhammad reported her finding—that the union officials falsified their time records and committed time theft—to Labor Relations Director Pamela DiStefano. Kuratli and Clark-Muhammad both recommended to DiStefano that the company should discharge the three union officials. On July 1, 2016, Mondelez

discharged Vlashi, Gutierrez, and Scherer for falsifying time records and leaving the work area without authorization. Upon their discharge, Mondelez abandoned the overtime investigation.

## C

Throughout 2016, Mondelez changed various terms and conditions of employment without notifying or bargaining with the union.

*Short-Term Disability Leave Policy.* At least since 2012, Mondelez had a short-term disability leave policy, which required an employee returning from medical leave lasting five or more workdays to provide a doctor's note and be cleared by the medical department at least 24 hours before beginning their scheduled shift. In March 2016, Mondelez lengthened the time an employee must wait before returning to work after submitting a doctor's note. Under this revised policy, an employee returning from a short-term medical leave must submit a doctor's note to the medical department by 10 a.m. on the Wednesday prior to the week they are cleared to resume working. Failure to do so would preclude the employee from "being added back to the schedule for the following week." Mondelez implemented this revised policy without collectively bargaining with the union.

*Union Access to New Hires.* Mondelez periodically conducts a one-week orientation for its new employees. Traditionally, Mondelez permits union officials to meet privately with the new hires for one hour during that week. In that private meeting, the union collects employee information and union applications, completes dues checkoffs, and provides political action information.

But there was a sudden shift. In March 2016, Mondelez informed the union that the CBA had expired and that the union "would not be permitted to speak separately with the new hires." The management then sat in during the union portion of the May 12 new hire orientation. Mondelez altered the longstanding practice without notifying the union in advance or bargaining with it.

*Employee Shift Schedules.* In June and December 2016, Mondelez changed the shift times of the warehouse employees. Mondelez justified this change as an effort to conform the staggered and varied schedules of the warehouse employees to the schedules of other departments. To support this unilateral change, Mondelez cited Article 6, Section 2 of the expired CBA, which states: "The Company will endeavor to keep the starting time of all employees as uniform as possible, consistent with the operation of the bakery and other locations covered by this Agreement." Likewise, Mondelez made this change without consulting or bargaining with the union.

### D

Mondelez also delayed and failed to supply information requested by the union.

On May 13, 2016, Local 719 asked Mondelez for the names of employees who had been disciplined for violating the clock-in-clock-out policy from March 1, 2006, to March 1, 2016. The union sought this information to investigate any problems with the turnstile or the ID badges as potentially contributing to a rise in disciplinary actions over turnstile discrepancies. On September 9, Mondelez provided a partial response and followed up with additional information on January 5, 2017.

On July 7, 2016, Local 719 submitted a separate information request. This time, the union asked Mondelez to provide contact information for all new hires since June 2015 to coordinate a new hire orientation. Receiving no response for two months, the union repeated its request on September 8. Mondelez provided a partial list later that month and again in January 2017 but failed to provide a complete record of the new hires.

**II**

As a result of the events just described, Local 719 filed eight unfair labor practice charges against Mondelez. The Board's General Counsel filed a consolidated complaint against Mondelez, alleging various violations of the Act. First, the General Counsel claimed that Mondelez discouraged employees from engaging in union activities by discharging Vlashi, Gutierrez, and Scherer for assisting the union. *See* 29 U.S.C. § 158(a)(1), (3). Second, the General Counsel alleged that Mondelez failed to bargain collectively and in good faith by unilaterally changing the short-term disability leave policy, union access to new hires, and employee shift schedules. *See id.* § 158(a)(1), (5). Third, the General Counsel asserted that Mondelez failed to bargain collectively and in good faith by refusing to provide employee disciplinary records and new hire information as requested by the union. *See id.* § 158(a)(1), (5).

After a seven-day hearing, an administrative law judge concluded that Mondelez had violated the Act on each of those claims. As to the unlawful discharge claim, the ALJ applied a two-part burden-shifting test from *Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), to assess whether antiunion animus motivated a discharge in violation of § 8(a)(3) and (a)(1). The

ALJ said yes, finding that Melgar's overtime study was "applied in a disparate and discriminatory manner to single out the top union echelon." Characterizing the overtime investigation as a "sham," the ALJ highlighted Mondelez's failure to render any "meaningful investigative follow-up" to assess "the veracity of the explanations provided by the workers" before their discharge. The ALJ also determined that Mondelez unilaterally changed the terms and conditions of employment in violation of § 8(a)(5) and (a)(1). In making that determination—specifically as to the short-term disability policy and the employee shift schedules—the ALJ applied the "sound arguable basis" standard, which allows an employer to take unilateral action if it is based on a reasonable interpretation of the CBA. And finally, the ALJ concluded that Mondelez violated § 8(a)(5) and (a)(1) by failing to timely and completely furnish information requested by the union.

The Board affirmed the ALJ's recommended order, with three relevant clarifications. Citing an intervening decision, *Tschiggfrie Properties, Ltd.*, 368 N.L.R.B. 120 (2019), the Board clarified that the unlawful-motivation analysis under *Wright Line* requires a sufficient causal connection between the adverse employment action and the protected activity. The record, the Board found, "amply establishe[d]" the necessary causal relationship here. The remaining two clarifications addressed the ALJ's application of the "sound arguable basis" standard to assess the unilateral change claims relating to the short-term disability leave policy and employee shift schedules. The Board explained that this standard only applies to an active CBA, making it inapplicable to disputes involving an *expired* agreement as here.

Mondelez petitioned for our review of the Board's decision and order, and the Board cross-petitioned for enforcement. Because Mondelez is an Illinois corporation, we have jurisdiction over the petition for review and the cross-application for enforcement under 29 U.S.C. § 160(f).

### III

The National Labor Relations Act protects an employee's right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) prohibits an employer from interfering, restraining, or coercing an employee for exercising the rights guaranteed by the Act. An employer violates § 8(a)(3) by unlawfully discharging an employee due to union activity. And § 8(a)(5) bars employers from refusing to bargain collectively and in good faith with the union. A violation of either § 8(a)(3) or § 8(a)(5) derivatively violates § 8(a)(1). *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

When reviewing a Board decision, we assess "whether substantial evidence supports the Board's factual findings and whether legal conclusions have a reasonable basis in law." *Constellation Brands U.S. Operations, Inc. v. NLRB*, 992 F.3d 642, 646 (7th Cir. 2021); *see* 29 U.S.C. § 160(e). We look to "such relevant evidence that a reasonable mind might accept as adequate to support the conclusions of the Board." *NLRB v. Teamsters Gen. Local Union No. 200*, 723 F.3d 778, 783 (7th Cir. 2013) (internal quotation marks omitted). Under this deferential standard of review, we examine the "existing administrative record," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), and "give great deference to an agency's credibility determination, overturning it only in extraordinary circumstances." *Witter v. Commodity Futures Trading Comm'n*, 832

F.3d 745, 750 (7th Cir. 2016). We need not "reweigh the evidence." *AutoNation, Inc. v. NLRB*, 801 F.3d 767, 771 (7th Cir. 2015) (internal quotation marks omitted). Our only task is to evaluate "whether there is evidence in the record supporting the Board's outcome that would satisfy a reasonable fact finder." *NLRB v. KSM Indus., Inc.*, 682 F.3d 537, 544 (7th Cir. 2012).

We discuss, in turn, the Board's conclusion that Mondelez unlawfully discharged union officials, unilaterally changed various conditions of employment, and unreasonably delayed and failed to furnish relevant information requested by the union.

## A

First up is the Board's finding that Mondelez discharged Vlashi, Gutierrez, and Scherer in violation of § 8(a)(3) and (a)(1). To make a prima facie case under subsection (a)(3), the General Counsel must make a "showing sufficient to support the inference that protected conduct was a motivating factor in the employer's decision." *AutoNation*, 801 F.3d at 774 (internal quotation marks omitted). We apply the two-part *Wright Line* burden-shifting framework to examine an employer's motivation in discharging a union member. 251 N.L.R.B. at 1089. *See, e.g., NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400–04 (1983) (upholding *Wright Line*), *abrogated on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994).

Under *Wright Line* step one, we assess whether the General Counsel "has shown that antiunion animus was a substantial or motivating factor in the discharge." *Big Ridge, Inc. v. NLRB*, 808 F.3d 705, 713 (7th Cir. 2015). The General Counsel can

satisfy this burden by demonstrating: "(1) the employee en-
gaged in a protected activity; (2) the decisionmaker knew it;
and (3) the employer acted because of antiunion animus." *Id.*
(internal quotation marks omitted); *see also Tschiggfrie*, 368
N.L.R.B. 120, at *10 (emphasizing that the *Wright Line* test is
"inherently a causation test"). Simply pointing to *any*
evidence of employer's animus is not enough to sustain this
burden. *Tschiggfrie*, 368 N.L.R.B. 120, at *10 ("The General
Counsel does not *invariably* sustain this burden of proof under
*Wright Line* whenever, in addition to protected activity and
knowledge thereof, the record contains *any* evidence of the
employer's animus or hostility toward union or other pro-
tected activity."). Rather, "the evidence must be sufficient to
establish that a causal relationship exists between the em-
ployee's protected activity and the employer's adverse action
against the employee." *Id.* at *11.

Once the General Counsel meets this initial burden, we
move to step two: The employer can rebut the evidence by
showing that it would have discharged the employee even "in
the absence of the protected conduct." *Wright Line*, 251
N.L.R.B. at 1089; *see Big Ridge*, 808 F.3d at 714. We need not
accept an employer's explanation, however, "if there is a rea-
sonable basis for believing it furnished the excuse rather than
the reason for [the] retaliatory action." *Big Ridge*, 808 F.3d at
714 (alteration in original) (internal quotation marks omitted).
At either step of *Wright Line*, the Board may infer discrimina-
tory motive based on direct or circumstantial evidence.
*Loparex LLC v. NLRB*, 591 F.3d 540, 546 (7th Cir. 2009).

Substantial evidence supports the Board's conclusion that
the union activity of Vlashi, Gutierrez, and Scherer was a mo-
tivating factor in their discharge. The Board highlighted that,

based on the record, Mondelez knew the three union officials regularly engaged in union activities. Take, for example, their union advocacy in early 2016. Gutierrez protested the unilateral change to the short-term disability leave policy; Scherer challenged Mondelez's use of subcontractors to perform overtime work; and Vlashi participated in CBA negotiations and spoke at the union rallies. The three union officials were visible and vocal advocates, who frequently corresponded with the management and supervisors. It is against this backdrop the Board concluded Mondelez had knowledge that Vlashi, Gutierrez, and Scherer engaged in union activity. That is a permissible reading of the record.

Likewise, ample evidence supports the Board's finding that antiunion animus was a motivating factor in the union officials' discharge. When unionized workers wore company-issued shirts with pro-union logo and slogan, Kuratli ordered them removed and returned to management, sharply disapproving the protest measure. Kuratli responded similarly when she ordered the American flags be taken down. Further, the Board pointed to Mondelez supervisors uttering hostile remarks aimed at the union officials and deriding the expired CBA. And importantly, the Board emphasized the "temporal proximity" between the union campaigns and the termination of the three union officials. All this together, the Board concluded, demonstrates that antiunion animus was a motivating factor in Mondelez's decision to discharge the three union officials.

On appeal, Mondelez pushes back. First, the company claims it lacked knowledge of the three union officials' activities because the Labor Relations Director DiStefano did not know. Second, Mondelez argues that the Board ignored

critical facts when concluding that temporal proximity established a causal link. Third, it asserts that the Board's disparate treatment finding lacks support.

All three contentions fall short. Start with the claim that Mondelez lacked requisite knowledge. This argument presumes not only that DiStefano was the sole decisionmaker for Mondelez, but also that the General Counsel failed to establish her knowledge of the union activities of Vlashi, Gutierrez, and Scherer. Substantial evidence demonstrates otherwise. In her testimony, DiStefano stated that when discharging an employee, she and other members of management must "align[] on decisions," meaning she was not the only person responsible for discharging Vlashi, Gutierrez, and Scherer. The record indicates that Kuratli (who ordered the overtime study) and Clark-Muhammad (who spearheaded the investigatory interviews) were intimately involved. They shared notes with DiStefano, and both recommended discharging the three union officials. And given that Vlashi, Gutierrez, and Scherer were widely recognized union advocates at the Fair Lawn plant, it is a permissible reading of the record that Mondelez knew of their union activism.

It was also reasonable for the Board to conclude that "temporal proximity" establishes the causal link between the three officials' union activity and their discharge. Mondelez insists that the timing of their discharge did not "align" with the union activity and that Melgar's overtime study had commenced six months prior to any alleged unfair labor practice. But when the overtime study began is of no moment. Underscoring Mondelez's "abrupt and insufficiently explained abandonment" of the overtime study, the Board stated that "whatever the initial reason for the study, in practice it

devolved into a pretext" for discharging the "three high-profile and combative union representatives." And to arrive at this conclusion, the Board considered factors besides temporal proximity: how the overtime study and follow-through were "truncated"; how Mondelez provided "insufficient" explanations for the abandonment of the study; and how the company suspended and discharged Vlashi, Gutierrez, and Scherer but took "no action against other employees who engaged in the same misconduct, some of whom were more egregious offenders than the discriminatees."

Substantial evidence likewise supports the Board's disparate treatment finding. Among the 59 employees on the overtime study list, only five were targeted for a follow-up investigation.[4] That Koroskoski and Naumoski were included in the investigation does not undermine the Board's conclusion that Mondelez discharged the three union officials due to antiunion animus. That is because neither Koroskoski nor Naumoski is a good comparator. Koroskoski was caught using Gutierrez's card, so for Mondelez to discharge Gutierrez, it made sense to also terminate Koroskoski. Naumoski, for his part, had the most egregious overtime discrepancies. What is more, the ALJ and the Board found that Mondelez failed to address the overtime discrepancies of the remaining employees on Melgar's list or to provide any explanation.

Mondelez contends it would have discharged Vlashi, Gutierrez, and Scherer despite their union activities. But this too falls short. For one, the Board found that the abrupt abandonment of the overtime study suggests pretext. Recall that

---

[4] Gutierrez was not among the 59 employees. While Naumoski was listed in the overtime study, he retired before any discipline.

as soon as Vlashi, Gutierrez, and Scherer were discharged, Mondelez halted the overtime study "without taking any action with regard to its overtime cost problem." The Board emphasized that Mondelez's failure to conduct a "meaningful" investigation suggested its discriminatory intent. *See, e.g.*, *Airgas USA, LLC*, 366 N.L.R.B. 104, at *2 (2018) (noting that an employer's "failure to conduct a meaningful investigation" demonstrates animus). Indeed, Mondelez suspended and discharged the three union officials but did not pursue any actions against other serious offenders. As the ALJ recognized, and the Board agreed, Mondelez failed to provide a credible reason for this "sudden change of course." Not only was the investigation truncated, the Board continued, but also "neither the employees nor [Local 719] had a reasonable opportunity to respond" to the record falsification and time theft allegations. The Board agreed with the ALJ that "one could reasonably conclude that the investigation was already completed before their meeting and that the meeting was merely a pro forma exercise" because "the record is devoid of any credible evidence of a meaningful investigative follow-up."

Given this record, the Board reasonably concluded that Mondelez's justification was pretextual. There is ample support for "an inference that stealing time was not the real reason why Gutierrez, Scherer, and Vlashi were discharged." Substantial evidence therefore supports the Board's conclusion that Mondelez failed to prove it would have suspended and discharged the union officials even in the absence of their union activities.

**B**

Next up is the Board's finding that Mondelez unilaterally changed the short-term disability leave plan, union access to

new hires, and employee shift schedules, in violation of § 8(a)(5) and (a)(1).

Section 8(a)(5) bars employers from refusing to collectively bargain in good faith with a union. 29 U.S.C. § 158(a)(5). An employer violates § 8(a)(5) by unilaterally changing conditions of employment, including "wages, hours, and other terms and conditions of employment." *Spurlino Materials, LLC v. NLRB*, 645 F.3d 870, 879 (7th Cir. 2011) (quoting 29 U.S.C. § 158(d)). To trigger § 8(a)(5), the challenged change must be "material, substantial, and significant." *Caterpillar, Inc.*, 355 N.L.R.B. 521, 522 (2010). In other words, unlawful unilateral changes occur when "there is an employment practice concerning a mandatory bargaining subject, and [] the employer has made a significant change thereto *without bargaining*." *Bath Iron Works Corp.*, 345 N.L.R.B. 499, 501 (2005). An "employer's unilateral change in conditions of employment under negotiation" violates § 8(a)(5) because "it is a circumvention of the duty to negotiate." *NLRB v. Katz*, 369 U.S. 736, 743 (1962).

With this background, we examine the Board's finding that Mondelez unilaterally changed the terms and conditions of employment in violation of the Act. Mondelez concedes it unilaterally changed three conditions of employment but argues that the changes were either immaterial or permissible.

*First*, the Board determined that Mondelez unlawfully lengthened the return timeframe for employees on short-term disability leave. The original policy allowed employees to return to active duty within one day of medical clearance. The revised policy, the Board recognized, "extended that timeframe from at least 2 to as many as 7 workdays." For example, if an employee on a short-term disability leave

submitted their doctor's note after the Wednesday 10 a.m. cutoff time, he would not be scheduled to a shift until the following workweek.

Mondelez concedes that it unilaterally revised this policy yet claims that any change was immaterial. Not so. The Board affirmed the ALJ's finding that the extended return timeframe "affected the amount of wages that worker would earn." And by the Board's count, the revised policy would potentially deprive an employee of two to seven days' wages. Given that short-term disability policy is a mandatory bargaining subject, *Am. Water Works Co.*, 361 N.L.R.B. 64, 66 (2014), substantial evidence supports the Board's conclusion that Mondelez violated § 8(a)(5) and (a)(1) by unilaterally changing its short-term disability leave policy.

*Second*, the Board found that Mondelez unilaterally changed a longstanding practice of allowing the union to conduct a private meeting during the new hire orientation. True, the union's private access to new employees is not an express employment condition. Even still, § 8(a)(5) extends to employer's "regular and long-standing" practices that are neither "random" nor "intermittent." *Sunoco, Inc.*, 349 N.L.R.B. 240, 244 (2007). And union access to employees is a mandatory bargaining subject. *See N. Mem'l Health Care v. NLRB*, 860 F.3d 639, 648 (8th Cir. 2017).

Mondelez acknowledges that it unilaterally changed this longstanding practice as well, yet it asserts the change was immaterial. Again, we disagree. The company relies on *Peerless Food Prods., Inc.*, 236 N.L.R.B. 161 (1978), to no avail. The Board concluded in *Peerless* that a company's unilateral change limiting some aspects of a union representative's access to employees did not amount to a material, substantial,

or significant change. *Id.* at 161. The policy change in *Peerless*, however, applied indiscriminately to all nonemployees and did not affect the union's representation access.

In contrast, here the Board agreed with the ALJ's finding that "eliminating [Local 719's] right to meet separately with newly hired unit employees during their orientations" was material. The ALJ, crediting a union official's testimony, found that the newly imposed limitations on union access to new employees had a "chilling effect on soliciting contributions" and undermined "other union-related discussions." On this record, the Board's conclusion that Mondelez violated § 8(a)(5) and (a)(1) was reasonable.

*Third*, the Board determined that Mondelez unilaterally changed its warehouse employees' shift schedules without bargaining with the union. On this claim, too, Mondelez concedes unilaterally changing the policy. The company argues that it was only "aligning" the employees' shift schedules based on the language of the expired CBA, which stated that the starting time of the employees will be kept "as uniform as possible."

The Board correctly dismissed this argument. It first clarified that the "sound arguable basis" standard, which the ALJ employed, does not apply to cases involving an expired CBA. The proper inquiry, the Board explained, is whether Mondelez unilaterally changed a term or condition of employment, not whether its unilateral actions were based on a reasonable interpretation of contract language. Given that employee work schedules are mandatory bargaining subjects, *Bloomfield Health Care Ctr.*, 352 N.L.R.B. 252, 256 (2008), the Board determined that Mondelez violated § 8(a)(5) and (a)(1) by altering the warehouse employees' shift schedules without

bargaining collectively. Substantial evidence supports this conclusion.

## C

That leaves a final question: Does substantial evidence support the Board's finding that Mondelez failed to timely and completely furnish relevant information requested by the union?

Section 8(a)(5) requires employers "to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967). This court has held that "unions should receive a broad range of potentially useful information to fulfill these obligations." *Nat'l Steel Corp. v. NLRB*, 324 F.3d 928, 934 (7th Cir. 2003). The General Counsel needs to show only "a probability that the information is relevant and that it will be of use to the union in carrying out its statutory duties." *Id.* (internal quotation marks omitted); *see also Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1191 (D.C. Cir. 2000) (noting that "the threshold for relevance is low"). Any information that directly relates to the bargaining unit employees is "presumptively relevant." *Gen. Elec. Co. v. NLRB*, 916 F.2d 1163, 1171 (7th Cir. 1990) (internal quotation marks omitted); *see Mountain View Country Club, Inc.*, 359 N.L.R.B. 914, 916 (2013) (explaining that disciplinary records are presumed relevant).

An employer's unreasonable delay in providing the requested relevant information violates § 8(a)(5). *See Monmouth Care Ctr.*, 354 N.L.R.B. 11, 51 (2009) ("An unreasonable delay in furnishing such information is as much of a violation of Section 8(a)(5) of the Act as a refusal to furnish the

information at all."). When a union official requests relevant information, "the employer has a duty to supply the information in a timely fashion or to adequately explain why the information was not furnished." *Regency Serv. Carts, Inc.*, 345 N.L.R.B. 671, 707 (2005). A seven-week delay, for example, is considered untimely. *See Woodland Clinic*, 331 N.L.R.B. 735, 737 (2000). Nor can an employer refuse to provide the requested information by asserting that it is "confidential." *Nat'l Steel Corp*, 324 F.3d at 934; *see also Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276, 294 (3d Cir. 2020) (noting that "a naked assertion of confidentiality is insufficient" to reject a union's request for relevant information).

Mondelez contends it delayed furnishing the employee disciplinary records because the union's request constituted impermissible prehearing discovery. To be sure, under Board precedent, a union may not use information requests as a prehearing discovery device on a pending unfair labor practice charge. *Union-Tribune Publ'g Co.*, 307 N.L.R.B. 25, 26 (1992); *see also Teachers Coll. Columbia Univ. v. NLRB*, 902 F.3d 296, 307 (D.C. Cir. 2018) (same). The requested disciplinary records, Mondelez argues, directly related to the union's charge against the clock-in-clock-out policy so the request would be improper.

Yet the timing of the union's request undermines Mondelez's argument. On May 13, 2016, the union requested employee disciplinary records as part of its investigation to evaluate "whether there was an increase in disciplining workers subsequent to the [clock-in-clock-out] policy change." That request related directly to the union's March 28, 2016 grievance, which alleged Mondelez made a unilateral change to the clock-in-clock-out policy. It was not until June 23, 2016,

that the union filed an unfair labor charge against Mondelez on that issue. That means the information request predated the union's charge. So when the union submitted its information request, there was no pending charge—only a pending grievance.

Here, the ALJ found, and the Board affirmed, that Mondelez unreasonably delayed supplying the requested disciplinary records in violation of § 8(a)(5). The ALJ credited the information request as "reasonable, appropriate, and necessary" for the union to adequately represent its employees in the grievance process. Turning to timing, the ALJ determined that Mondelez failed to "substantially comply" with the May 2016 request until January 5, 2017—a delay of more than seven months. Citing Board precedent, the ALJ found this delay to be unreasonable. *See, e.g., Woodland Clinic*, 331 N.L.R.B. at 707 (seven-week delay); *Bundy Corp.*, 292 N.L.R.B. 671, 672 (1989) (ten-week delay with "specious" reasons); *see also NLRB v. Ingredion Inc.*, 930 F.3d 509, 517–18 (D.C. Cir. 2019) (citing *Woodland Clinic* and *Bundy Corp.* as examples of "unjustified delay" under § 8(a)(5)).

Mondelez's "discovery" argument fares no better. The ALJ explained that an "employer must timely respond to a union's request seeking relevant information even when the employer believes it has grounds for not providing the information." Here, it was not until September 9, 2016, that Clark-Muhammad informed the union that the record compilation had taken "an unusually long amount of time." And even then, she did not request additional time to produce the documents. This is sufficient to support the Board's decision that Mondelez unreasonably delayed supplying the requested disciplinary records, in violation of § 8(a)(5) and (a)(1).

Here, too, substantial evidence supports the finding that Mondelez failed to provide a complete record of the new hires as requested by the union in violation of § 8(a)(5) and (a)(1). In July 2016, the union requested a full list of newly hired employees from "June 2015 to the present." This request, the ALJ concluded, was necessary and reasonable for the union to coordinate a new hire orientation. After receiving no response from Mondelez, the union sent another request two months later on September 8, 2016. But the ALJ found "nothing in the record to show that [the union's] September 8 reaffirmation of [the] request was acknowledged or followed-up by Clark-Muhammad."

Mondelez fails to mount any meaningful counter to this finding. It offers the same "discovery" contention as above: that the request for new hire information constituted impermissible prehearing discovery related to the union's allegation that Mondelez refused to deduct union dues from new employees' pay. The ALJ properly rejected this assertion, noting that the union's "primary focus" for its information request "was to ensure that new hires receive their union orientation," not an effort to conduct discovery on the dues-deduction charge. At bottom, it was reasonable for the Board to conclude that Mondelez failed to provide a complete record of the new hires as requested in violation of § 8(a)(5) and (a)(1).

## IV

Substantial evidence supports the Board's decision as to each of the conclusions Mondelez disputes. So we DENY Mondelez's petition for review and GRANT the Board's cross-application for enforcement.